## Augustine Gonzales v. The State.

### No. 22. *Decided February 1.*

**1. Murder — Competency of Jurors — Conscientious Scruples.—** The punishment for murder in the first degree, as provided in article 609 of the Penal Code, is death or confinement in the penitentiary for life. With regard to challenges for cause to jurors, it is expressly provided as one of such causes by the eleventh subdivision of article 636, Code of Criminal Procedure, "that the juror has conscientious scruples in regard to the infliction of death for crime." *Held*, on a trial for murder it is the duty of the court to see that a jury be organized, prepared and willing to assess either penalty. And where on their voir dire examination as to their qualifications one or more jurors answered that they had conscientious scruples in regard to the infliction of the death penalty, it was the duty of the court, of its own motion and for this cause, to stand them aside.

**2. Evidence — Motive — Letters of Third Party.—** On a trial for murder, it having been proved that deceased and his wife while on a visit to the city of C., quarreled because she expressed a desire to live in that city, and that upon the return of the parties home, at B., the deceased received two letters from her sister requesting her to return to the city of C., which letters had been lost and could not be found, *held*, a proper predicate having been laid, the court properly admitted testimony to prove contents of said letters as tending, in the light of other testimony adduced, to explain defendant's motive for the murder.

**3. Defendant's Testimony, Impeachment of — Contradictory Statements.—** A defendant's testimony as a witness may be impeached by his contradictory statements made while he was under arrest or in custody. Following Quintana v. The State, 29 Texas Court of Appeals, 401; Ferguson v. The State, ante, p. 93.

**4. Temporary Insanity from the Recent Use of Intoxicating Liquor — Charge of Court.—** In order to raise the question of temporary insanity from the voluntary recent use of ardent spirits, the drinking must precede the homicide, and the effects of such intoxicants must be operative on the mind of the accused at the time of the commission of the crime, to the extent of rendering him temporarily insane. It is not sufficient that he became insane from liquor used subsequent to the commission of the crime. The evidence failed to show that defendant was under the influence of liquor at the time he killed his wife, and the court refused to charge the jury as to temporary insanity resulting from the recent use of intoxicants, but did instruct them as follows, viz.: "Intoxication produced by the recent use of ardent spirits constitutes no excuse for the commission of crime, nor does intoxication mitigate either the degree or penalty of crime. However, in a case where the defendant is accused of murder, as in the case before you, you may take into consideration

the mental condition of defendant, for the purpose of determining the degree of murder, if you should find the defendant guilty of murder, under the evidence." *Held.* that the charge was more favorable to the defendant than the facts warranted, and that defendant had no ground of complaint.

5. **Evidence Sufficient.**—See a case for evidence which in the opinion of the court was amply sufficient to support a verdict and judgment for murder in the first degree, with the death penalty.

APPEAL from the District Court of Bee. Tried below before Hon. JAS. C. WILSON.

This appeal is from a judgment of conviction for murder of the first degree, the penalty being assessed at death. The murdered victim was appellant's wife, and she was killed with a knife.

Palao Gonzales, for the State, testified: I am about 14 years old, and am the daughter of defendant, Augustine Gonzales, and deceased, Tosora Gonzales. On the night of March 24, 1892, my father came home just at night, and remained there until awhile before day. My father and mother went to bed together, and I went to bed in same tent with them, on the floor. Away in the night I was wakened by my mother stepping on my foot, and at the same time I heard her say, "Do not kill me with that knife;" and my father said, "Do not be a coward, it is only a stick." My mother fell, and my father went out of the tent, and said to me that I now had "no mother nor father," only the people at the hotel. He then left, and about sunup came back again; came to the door of the tent and said, as he looked at my mother's body, on the ground, dead, "You are just where I wanted to see you; with four candles burning around you." He then said, we, speaking to us children, had no mother nor father, only the people at the hotel, and then left. This was in Bee County, Texas. Defendant at the bar is my father.

That night, after committing the murder, defendant went to the hotel where he worked, about 3:30 or 4 o'clock a. m., and went to the room of the witness Arthur Lott, and told Lott that he had killed his wife on account of some letters his wife had received from a man in Corpus Christi; that defendant gave him the two letters, and he, witness, afterwards turned them over to Sheriff Walton. That defendant had a "two-bit" bottle of whisky with him; he was drinking some, and looked like he was under the influence of whisky some. Witness said that he seemed to be sober enough to know what he was talking about. Defendant was arrested at the hotel, and that same evening his examination held by the justice of the peace. The county attorney who prosecuted at that trial and the justice of the peace who held the trial both testified, that they cautioned and warned the defendant that any voluntary statement he might make could be used as evidence against him at his trial. That defendant did make a voluntary statement, which was reduced to writing, signed and sworn to by the defendant, and properly certified to by the

justice of the peace. The State introduced the voluntary statement, which was as follows:

"I killed my wife, Tosora Rodrigues, because she was too intimate with another man. Killed her with a butcher knife. Have five children by this woman. Was married in Matamoros by a justice of the peace fourteen years ago. Saw a man killed in Corpus Christi about her, about one month ago. Didn't kill the man, because didn't have time to go to Corpus Christi. Killed her about 2 o'clock on Friday morning, March 25, 1892. Went home about 9 o'clock; at 2 o'clock took a notion to kill her.

[Signed]                                    his
                               "Augustine X Gonzales."
                                           mark.

The letters which the witness Arthur Lott testified that defendant had given him, and which he (witness) had turned over to the sheriff, were shown by the sheriff to have been lost by him, after he had received them from Lott.

The State proved by County Attorney McCampbell and Sheriff Walton and Nat Parks that defendant, in their presence, on the day after the killing, in the jail, said that he had killed his wife, was glad of it, and laughed about it.

Defendant testified as a witness in his own behalf. Stated that he went home the night of the killing, and found some musicians playing at his house. That in the night he and his wife, after they had gone to bed, got to quarreling about the musicians having been there. He told his wife that they could not agree; that she had better go to Corpus Christi. He said, "I got up and left the tent, and do not remember anything that happened until the next day I found myself in jail." He stated that he was drunk, and that when he was drunk he was unconscious of what he did. He denied making the confessions testified to by the other witnesses.

*C. F. Stevens*, for appellant, filed a brief and elaborate argument.

*R. L. Henry*, Assistant Attorney-General, for the State.

DAVIDSON, Judge.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

1. The first juror called, on his voir dire, stated that he had "conscientious scruples in regard to the infliction of the punishment of death for crime," and was challenged by the prosecution. The court subsequently, and until the eighth juror had been empanelled, without objection of defendant, examined the jurors in reference to the causes for challenge, and, as the juror affirmed his scruples in reference to the infliction of capital punishment, would himself excuse the jurors. The defendant

then interposed objections to this manner of examining the jurors, and thereafter one or two jurors were thus excused by the court. The court then directed the district attorney to conduct the examination. The action of the court was correct. Appellant was arraigned upon a capital charge, and if convicted thereof it might have been to the interest of society for him to have suffered the extreme penalty. It was therefore the duty of the court to see to it that a jury be organized, prepared and willing to assess either penalty, as they should view the facts and circumstances.

2. While on a visit to Corpus Christi defendant quarreled with his wife because she expressed a desire to live in that city, he preferring to reside at Beeville. After they returned to Beeville a sister of the deceased wrote her two letters, requesting her return to Corpus Christi. Over defendant's objections, the State proved that the letters were written, as well as the request contained in them. The letters were lost or misplaced and could not be found. Hence the proof of their contents. A proper predicate was laid for the introduction of this testimony, and it was relevant to the issue of malice, and in the light of other testimony adduced tended to explain defendant's motive for the murder.

3. Testifying in his own behalf, defendant denied stating while in jail "that he killed his wife, and was glad of it." The testimony was admitted as impeaching evidence, over defendant's objection. The court did not err in admitting this testimony. Quintana v. The State, 29 Texas Ct. App., 401; Ferguson v. The State, ante, p. 93.

4. As presented by the bill of exceptions, the remarks of the district attorney were not injurious. If their impropriety be admitted, they were provoked by and made in reference to remarks by defendant's counsel. Baker v. The State, 4 Texas Ct. App., 223; Williams v. The State, 24 Texas Ct. App., 32; Willson's Crim. Stats., sec. 2321.

With reference to drunkenness, the court charged the jury, "that intoxication produced by the voluntary recent use of ardent spirits constitutes no excuse for the commission of crime, nor does intoxication mitigate either the degree or penalty of crime. However, in a case where the defendant is accused of murder, as in the case before you, you may take into consideration the mental condition of the defendant for the purpose of determining the degree of murder, if you should find defendant guilty of murder under the evidence." In this connection the defendant requested and was refused an instruction in relation to temporary insanity produced by the voluntary recent use of intoxicating liquor.

Bearing upon this question, the evidence of defendant's daughter is that her father had no whisky at the time of the murder. Lott testified, that he and defendant worked at the same hotel together; that defendant left the hotel for home, as was his custom, about 9 o'clock at night; that about half-past 3 or 4 o'clock of the same night, defendant came to the

room of witness and informed him that he had killed his wife, and that he had killed her on account of some letters she had received from a man in Corpus Christi. Defendant then pulled " out a 25-cent flask of whisky, and wanted me to drink, which I declined to do. He was drinking some; finished drinking the flask, and threw it empty on the floor. He was sober enough to know what he was doing." This occurred about one and a half or two hours subsequent to the homicide. When arrested on the day following by the officers, " defendant was drinking some."

On his examining trial he stated he killed his wife " because she had been too intimate with another man." " Killed her about 2 o'clock on Friday morning, March 25, 1892. Went home about 9 o'clock. At 2 o'clock, took a notion to kill her. Had no whisky."

On final trial he testified, that on reaching home the night of the homicide, he found " some Mexican musicians playing at his house, and quarreled with his wife about it. In the night he again quarreled with her about the Mexicans, and she finally said, if we could not agree she had better go to Corpus Christi. I had a 25-cent bottle of whisky that I got a small boy to buy for me on that evening." He also bought a bottle of whisky during the day preceding the night of the homicide. He " did not get it himself, but gave a small boy, whom he did not know, 25 cents to get the whisky for him. At night he got more himself." After quarreling with his wife, he did " not remember anything that happened until next day." But on cross-examination he testified fully and distinctly in relation to all of his acts up to the moment of the homicide, as well as to all his movements thereafter. In fact, his memory seemed to be clear and distinct as to all such matters. The evidence does not show him to have been under the influence of intoxicants at the time of or prior to the homicide. No witness testified to his drunken condition prior to the killing. The extent of the testimony in this respect is, that sometime after the killing he was " somewhat under the influence of whisky."

In order to raise the question of temporary insanity from the voluntary recent use of liquor, the drinking must precede the homicide, and the effect of such intoxicants must be operative on the mind of the accused at the time of the commission of the crime to the extent of rendering him temporarily insane at the time of the killing. It is not sufficient that he became insane from liquor used subsequent to the commission of the crime.

The charge of the court was more favorable to the defendant than warranted by the facts. If he was not under the influence of liquor at the time of or prior to the homicide, temporary insanity produced from voluntary recent use of ardent spirits could not have been an issue in the case. The jury having repudiated the theory, under the charge of the court quoted, that his mental condition was affected by intoxication,

it is not probable, or even possible, they would have accredited him with temporary insanity under facts found by them insufficient to support the theory of intoxication.    The court did not err in refusing requested instructions in relation to insanity.

The killing is shown to have been done upon express malice, and was an atrocious murder.    The attendant circumstances disclose a depraved and malignant spirit, and evidence a heart utterly regardless of every feeling of humanity.    With a fiendish delight he gloated over his horrible deed; and, as he saw her lifeblood flowing from the eleven fatal wounds inflicted by his murderous hand, said that she was "just where he wanted to see her, with four candles burning around her;" and with evident delight gloried in the fact, caused by his brutal act, that the burial service of the church of her love and life would soon be performed over her inanimate form.    The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.