# ED. SMITH v. STATE.

No. A-310.   Opinion Filed March 21. 1911.

(114 Pac. 350.)

1.   **JURY—Competency of Jurors—Conscientious Scruples Against Death Sentence.** Persons with conscientious scruples against the infliction of death as a punishment for crime are incompetent jurors where such penalty may be inflicted, although the statute permits the jury to fix the punishment either at death or imprisonment for life.

2.   **INDICTMENT AND INFORMATION—Trial—Indorsement of Witnesses on Indictment.** Where the record shows in a capital case that a list of the witnesses to be used upon the trial of said cause by the state was duly served upon the defendant more than two days before the trial began, the defendant cannot be heard to complain if the court permits such names to be indorsed on the indictment at any time during the trial.

3.   **HOMICIDE—Evidence—Dying Declarations—Admissibility.** Where it is shown by the testimony that immediately after being shot the deceased exclaimed, "Ed Smith has killed me," and where the deceased subsequently said to the physician who attended him, "I am all in," and never at any time after receiving the fatal wound expressed any hope or expectation of recovery. this, in connection with the fatal character of the wound received, justified the trial court in receiving the statements made by the deceased as dying declarations.

4.   **WITNESSES—Cross-Examination.** Where the defendant offers a witness who testifies that he heard the deceased make threats against the defendant, and that he communicated these threats to the defendant before the difficulty occurred, it is proper for the state on cross-examination to ask such witness what the defendant said, if anything, when he was informed of such alleged threats by said witness.

5.   **HOMICIDE—Instructions—Self-Defense.** (a) Where the issue of self-defense is presented by the testimony, the jury should be instructed that they must view the evidence in the case upon the question of danger or apparent danger to the defendant at the time he fired the fatal shot from the standpoint of the defendant, and as it then reasonably appeared to him.

(b) Although a requested instruction may correctly state a proposition of law applicable to the evidence in the case, yet it should not be given, where the same proposition has already been correctly stated in the general instruction to the jury.

6. **APPEAL—Reservation of Grounds of Review—Argument of Counsel.** If a defendant desires to present to this court any objections which were made to the argument of counsel for the state in the lower court, and any exceptions to the ruling of the lower court on said objections, the matters relied upon must be incorporated in the case-made in the form of a recital. stating fully what actually occurred at the time. This question cannot be raised alone upon the statements made in the motion for a new trial. The trial judge does not certify to the truth of the statements contained in the motion for a new trial, but simply certifies that such a motion was made.

7. **APPEAL—Discretion of Court—Motion for New Trial.** (a) Where in a motion for a new trial, an attempt is made to show that one of the jurors who sat in the case was prejudiced against the defendant, and affidavits are attached to the motion for a new trial supporting this charge, and the state replies with the affidavit of the juror denying such prejudice and controverting the statements made in the affidavits filed against him, this presents a question of fact to be determined by the trial court, and in the absence of a showing of abuse of discretion in this matter the judge's determination of this question of fact will not be disturbed by this court upon appeal.

 (b) In determining the question as to whether or not a given juror was disqualified to serve in a case upon the ground that he was prejudiced against the defendant, the decision does not necessarily depend upon the mere number of affidavits on one side or the other.

8. **HOMICIDE—Evidence—Admissibility.** It was not error for the trial court to permit the introduction of evidence showing that a horse belonging to the deceased was hitched near the place where the fatal shooting occurred.

(Syllabus by the Court.)

*Appeal from District Court, Coal County; A. T. West, Judge.*

Ed. Smith was convicted of manslaughter in the first degree, and he appeals. Affirmed.

*J. G. Ralls* and *C. M. Threadgill,* for appellant.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, PRESIDING JUDGE. First. When C. M. King, a member of the panel, was being examined as to his qualifications as a juror, he was asked as to whether or not he entertained such conscientious scruples against the infliction of death as a penalty for crime as would prevent him from rendering a verdict for murder

and assessing the death penalty in case he was taken on the jury, to which he answered that he did entertain such conscientious scruples, but he further answered that, whenever the law gave him the right to inflict the death penalty or imprisonment for life, he did not have such conscientious scruples as would prevent him from rendering a verdict of guilty for the crime of murder. The juror was thereupon challenged by the state, and the challenge was sustained by the court and the juror was discharged, to which ruling of the court defendant then and there excepted. In support of this challenge the appellant contends that as the penalty for murder is exclusively with the jury, and as they may assess either the one penalty or the other as they see fit, the state had no right to insist that the jury should assess the death penalty. The eighth paragraph of section 6812, Snyder's Comp. Laws of Okla. 1909, provides that a juror should not be compelled or permitted to serve in a cause when the offense is punishable with death, if such juror entertains conscientious scruples which would preclude him from finding the defendant guilty of such offense. We think that the court properly sustained the challenge for the state. The punishment for murder being in the alternative, the state had a right to have upon the jury only those who had no scruples against either form of punishment, but who would decide the matter entirely upon the issues as presented to them, without bias in favor of or against either manner of punishment.

In the case of *Thompson v. State,* 19 Tex. App. 593, that court said:

"Persons with conscientious scruples against the infliction of the death penalty are incompetent jurors, although the statute permits the jury to fix the punishment at imprisonment for life."

In the case of *Gonzales v. State,* 31 Tex. Cr. R. 508, 21 S. W. 253, that court said:

"Where a juror in a murder case answered that he has conscientious scruples in regard to the infliction of death, it is the duty of the court of its own motion to stand him aside."

But even if it was doubtful as to whether or not the court was correct in excusing the juror King, such action on its part

would not be ground for reversing the conviction. The defendant has no vested right to have any particular juror on the panel selected to serve in his case. His right is that of rejection rather than that of selection. If for any reason the trial court is of the opinion, or even suspects, that any given juror is not fair and impartial, or is otherwise disqualified, it is not only the right, but also the duty, of the court to excuse such juror, either upon challenge of one of the parties or upon motion of the court without such challenge. See *Boutcher v. State,* 4 Okla. Cr. 576, 111 Pac. 1006, 112 Pac. 762.

Second. Counsel for appellant complain that after the trial began the court, on motion of the county attorney, permitted the names of a number of witnesses to be indorsed on the indictment. The record on this subject is as follows:

"Be it remembered, that on this, the 13th day of March, 1909, the above numbered and styled cause came on for trial in open court before Hon. A. T. West, judge of the Seventh judicial district of Oklahoma; the defendants being present in person and represented by counsel, Ralls Bros. and C. M. Threadgill, and the state being represented by county attorney, J. R. Wood, W. L. Richards, and D. H. Linebaugh; whereupon a jury consisting of twelve good and lawful men was duly selected. The Court: Mr. Stenographer, let the record show that the court had requested the clerk to swear the jury; the jury had stood up and the oath was partially administered, whereupon the county attorney requested permission to indorse certain names on the back of the indictment, and the court instructed the jury to sit down. The defendant objected to the indorsement of the names on the indictment at this time. The court overruled the objection and granted permission to indorse the following names on the back of the indictment, to wit: Pat Perkins, Thos. Johnson, W. J. Conley, Ed Ryan, G. H. Letson, J. B. Maxey, D. McMillan, Dr. H. D. Filmore, W. H. Stouse, Tom Courtney, Broadus Montague. To which action of the court the defendants then and there duly excepted. Whereupon, the jury is duly sworn according to law to try the issues of this case."

On the 3d day of September, 1910, permission of the court being granted, the Attorney General filed the following amendment to the case-made:

"The State of Oklahoma v. Ed Smith and Henry Thaxton.

"To Ed Smith and Henry Thaxton, the Above-Named Defendants: Following is a list of the names and addresses of witnesses who have been subpœnaed, and who will be called to testify in behalf of the state upon the trial of the above-styled cause, in the above-styled court, which has been set to be tried on the 11th day of March, 1909: Jack Droke, Coalgate, Oklahoma; Joe Summers, Coalgate, Oklahoma; S. L. Jeter, Olney, Oklahoma; George Taylor, Coalgate, Oklahoma; Pat Perkins, Coalgate, Oklahoma; Thomas Johnson, Cario or Wardville, Oklahoma; W. J. Conley, Olney, Oklahoma; Ed Ryan, Coalgate, Oklahoma; G. H. Letson, Coalgate, Oklahoma; J. B. Maxey, Pine, Oklahoma; D. McMillan, Kittie or Hunton, Oklahoma; Dr. Filmore, Coalgate, Oklahoma; W. H. Stouse, Coalgate, Oklahoma; Tom Courtney, Coalgate, Oklahoma; Broadus Montague, Coalgate, Oklahoma; One Hood, Redden's Store or Aetna, Oklahoma. Very respectfully, [Signed] Jas. R. Wood, County Attorney, Coal County, Oklahoma."

"State of Oklahoma, County of Coal—ss.: I, J. F. Murphy, sheriff of Coal County, State of Oklahoma, do hereby certify that, on the 8th day of March, 1909, at 8 o'clock a. m. of said day, I received the above and foregoing list of witnesses, and that on the 8th day of March, 1909, I served the same by delivering to each of the above-named defendants a true and correct copy thereof. Witness my hand this ——— day of March, 1909. [Signed] J. F. Murphy, Sheriff of Coal County, Oklahoma, By S. L. Jeter, Deputy."

"Indorsements: 'No. 124, State of Oklahoma v. Ed Smith et al. List of Witnesses. Filed 3-9, 1909. H. A. Davis, Clerk. Jas. R. Wood, County Attorney, Coal County. Sheriff's Fees: Serving notice on Ed Smith 50, on Henry Thaxton 25, 25 miles 2.50; J. F. Murphy, Sheriff, by S. L. Jeter, Dept.'"

From this it is seen that on the 8th day of March, 1909, more than two days before the trial began, the defendant had a copy of the names of the witnesses to be used against him on the trial with the post office address of each witness, duly served upon him by the sheriff of Coal county. The defendant having this notice, the court did not err in permitting the county attorney to indorse the names of said witnesses upon the back of the indictment, even after the selection of the jury.

Third. Appellant contends that the court erred in not sus-

taining the objections made to the testimony of Dr. W. J. Conley
as to statements made to him by the deceased, upon the ground
that there was no evidence at the time of making said statements
that the deceased contemplated death. The state's witness Jack
Droke testified that he was the first person who reached the de-
ceased after the fatal shooting. In answer to the question as to
what the deceased said to him, he replied, "He just said that Ed
Smith had killed him; said that he would and had done it." Dr.
W. J. Conley testified that he was a physician; that at the time of
the homicide he was practicing medicine in Coalgate, and that
he was called upon to attend the deceased the night after he re-
ceived the fatal wound. He testified that the deceased was shot
about 1½ inches to the right of the center of the breast, just high
enough to cut the lower edge of the lung; that the ball ranged
down and backward and came out just behind the point of the
left hip; that another ball entered the right leg of the deceased
and inflicted only a flesh wound; that the wound in the breast
was necessarily fatal and caused the death of the deceased; that
the deceased was wounded on the evening of the 7th of October,
1908, and died on the night of the 9th of October, about 11
o'clock; that said witness waited upon the deceased continuously
after he was wounded until his death; that at no time did the
deceased express any hope of recovery, but, on the contrary, de-
ceased said to him that he was "all in"; that the deceased made
a statement to the witness as to the circumstances attending the
shooting; that he had started from Mr. Levin's store, and just
as he went to step up on a little wood gallery that the first thing
he saw was a pistol as it was pointed right in his face, and was
fired, and that he turned and fell, and some one shot him again
when he was down on his all fours; he said that Ed Smith ,the
defendant, was the man who shot him. We think that the evi-
dence clearly shows that the testimony offered was competent as
a dying declaration. The deceased had previously declared that
the defendant had killed him. At no time after receiving the
fatal wound did any one hear the deceased express a hope of

recovery.   On the contrary, he stated that he was "all in."  In connection with the fatal character of the wound which the deceased received, the evidence clearly shows that the deceased had no hope of recovery, and was in immediate expectation of death from the time that he received the wound.   The court therefore did not err in overruling the objection to the testimony of Dr. Conley.  See *Nelson v. State,* 3 Okla. Cr. 468, 106 Pac. 647.

Fourth.   Appellant contends that the court erred in overruling the motion made to exclude the testimony of the state's witness Dunk McMillan as to dying statements made by the deceased, because the evidence fails to show that the deceased apprehended death.   The witness asked the deceased  how it was that he was in difficulty with defendant Smith.   Deceased replied, "No, I never saw him until about the time he shot me."

"He said, 'I was on the sidewalk at a little barber shop; I had one foot on the sidewalk, and then started to get up with the other, and he shot me.   It liked to have killed me then; it knocked me back off of the sidewalk, and I fell and scrambled and stumbled together, and fell off into the ditch, and somebody shot me from behind in the leg.   It pained my leg, so I couldn't stand on the leg.'  I choked up at that time and commenced crying, and he didn't say any more; and directly he said, 'Well, go on and phone Maggie and the children.'  That was all the talk we had that day.  Q. Was there anything else said about his property?  A. Now, yes; right after that he said, 'I want you all to come in here after a while; just my own little crowd.'  He said, 'I want to tell you something another about my business.'  There was no more about Smith.  Q. He said, 'I want to tell you about my business,' that was part of the same conversation?  A. Yes; I went just a little too quick right there; then is when I went to crying.  Q. Now, just before his death, while he was dying, did you have any talk with him?  A. Just before his death?  Q. Yes.  A. Yes; a little bit.  Q. Did he say anything about his condition before this conversation you had with him.  A. The night before he died?  Q. Yes.  A. Yes.  Q. What did he say?  A. I didn't have much conversation with him myself that night; I had gone to bed that night, and somebody came in and woke Val McMillan, my brother, up, and I woke up, and I heard Neal talking.   His voice was getting weaker; I went in there and taken

hold of his hand, and he said, 'I am about gone.' And I do not know—somebody held me, I think it was Dr. Conley, back, and told me to tell Val to come on, he was dying. Val came in and asked him; he said, 'Neal. are you dying?' He said, 'Yes.' He said, 'Tell us who shot you.' He said, 'Ed Smith.' That is all Val said, I think; if he said any more, I do not remember about it."

When this evidence is considered in connection with the testimony of Dr. Conley and Jack Droke, we think that there can be no question but that the court did not err in admitting the testimony of the witness.

Fifth. Appellant insists that the court erred in overruling the objections to questions propounded on cross-examination to the witness E. B. Rateree. When this witness was on the stand, he testified in behalf of the defendant that the deceased had stated in his presence that the defendant had accused him of killing his hogs, and deceased said that the defendant should not stay in the country, and that he would kill the defendant, and said, "That he had tried to kill the peg-leg son of a bitch, but had failed to do so." The witness further testified that prior to the killing, toward the last of July, he had informed the defendant of what the deceased had said, and warned the defendant to be careful or the deceased would kill him. On cross-examination the state asked the witness what the defendant said when the witness told him of what the deceased had said, to which counsel for appellant objected. The objection was by the court overruled, and the witness replied, "He said it would come out all right in the washing." We think that the court did not err in allowing the state to prove what was said by the defendant at the time when he was informed of the alleged threats made by the deceased. The defendant having introduced a part of the conversation, the state on cross-examination had the right to draw out all that was said at the time relating to the same subject.

Sixth. The defendant requested the court to charge the jury as follows:

"The court instructs the jury that you are to view the evi-

5 Cr—19

dence in this case as to the question of the danger of the defendant at the time he fired the fatal shot from the viewpoint of the defendant."

—which instruction was by the court refused, and the defendant excepted thereto. It is the law that where the issue of self-defense is presented by the evidence, the jury should be instructed that they must view the evidence in the case upon the question of danger or apparent danger to the defendant at the time he fired the fatal shot from the viewpoint of the defendant, and as it then reasonably appeared to him. In this way only can the jury determine as to what was the intention of the defendant in firing such shot; but it was not error in this case for the court to refuse this requested instruction, because the court had already fully and correctly instructed the jury "the defendant had a right to defend himself from such danger or apparent danger as it appeared to him at the time, viewed from his standpoint." Although a requested instruction may correctly state a proposition of law, yet it should not be given where the same proposition is already stated in the general charge to the jury.

Seventh. The appellant complains of alleged improper remarks made in the closing argument of counsel for the prosecution. This is complained of for the first time in the appellant's motion for a new trial. We have examined the case-made, and find that it does not contain any statement certified to by the trial judge of any occurrence of this kind having taken place. A defendant can incorporate anything he wants to in his motion for a new trial, but this cannot be taken as evidence of the fact that the matter so incorporated really occurred. If a defendant desires to avail himself of objections made to the argument of counsel for the state which have been excepted to, such remarks of counsel and the action of the court in refusing to sustain such objections must be incorporated in the case-made in the form of a recital, and must contain a full statement of what actually occurred. This, when approved and certified to by the trial judge, will import absolute verity, and this court will be in a condition to determine as to whether or not the remarks made by counsel were

improper and were injurious to the appellant. Matters that occur in open court in the presence of the judge can only be made a part of the record when properly incorporated in the case-made and duly certified to by the trial judge. Such matters cannot be proven by statements contained in the motion for a new trial. The trial judge simply certifies that such a motion was made, but this is not a verification of any of the allegations contained therein. There has been a great deal of loose practice with reference to these matters in the past, and it is time that attorneys should know that, if they wish to assign errors with reference to any matter that occurs in open court, and which is within the knowledge of the trial judge, such matter must be incorporated in the record as above indicated; otherwise it will not be considered. See *Cochran v. State,* 4 Okla. Cr. 379, 111 Pac. 974; *Saunders v. State,* 4 Okla. Cr. 264, 111 Pac. 965.

Eighth. The tenth paragraph of the motion for a new trial filed in behalf of the defendant is as follows:

"Since the trial of this case this defendant has discovered that one of the jurors, John Huddard, that composed the jury that returned the verdict against this defendant was biased and prejudiced against this defendant, and had formed and expressed an opinion that the defendant was guilty, and that the defendant ought to be hung, all of which was unknown to the defendant and their attorneys at the time the juror was accepted and sworn, and said juror before having been accepted was interrogated as to whether he had any bias or prejudice against the defendants and stated that he did not, and said juror was also asked if he had formed or expressed an opinion as to the guilt or innocence of the defendant and stated that he had not, and this defendant supports this charge by affidavits and offers to produce further proof."

This motion was duly sworn to by appellant and was supported by the affidavits of John Cabe and Green Jackson, which are as follows:

"State of Oklahoma, Coal County—ss.: Ed Smith being first duly sworn according to law states on his oath that he is the above-named defendant, that he has read the above and foregoing

motion for a new trial, and that the statements contained therein are true. Ed Smith.

"Subscribed and sworn to before me, this the 9th day of March, 1909. [Seal.] H. A. Davis, Clerk."

"In the District Court for Coal County, State of Oklahoma. "State of Oklahoma, Plaintiff, v. Ed Smith, Defendant.

"J. M. Cabe, having been by me first duly sworn according to law, states upon his oath, that he is 58 years of age, that he is a white man and a resident of Coal county, state of Oklahoma, that he is acquainted with John Huddard, one of the jurors that composed the jury that tried the case of State of Oklahoma against Ed Smith et al., at this March, 1909, term of district court. Affiant states that in the store of Addison & Ellard in the town of Coalgate, some time in the latter part of February, 1909, he heard the said John Huddard state in regard to Ed Smith and the case against him as follows: 'That Ed Smith is guilty and he ought to be hung, and I wish they would get me on the jury. He ought to be hung a hundred feet high and a pile driver tied to his feet.' The affiant further states that he is not related to the defendant, and that he said nothing about this statement to any one until after the trial of the case against the said Ed Smith. Affiant further states that he has lived in what is now Coal county for the last 12 years. J. M. Cabe."

"Green Jackson having been by me first duly sworn according to law, states upon his oath, that he is 46 years of age, that he is one-eighth Indian by blood and a resident of Coal county, state of Oklahoma, that he is acquainted with John Huddard, one of the jurors that composed the jury that tried the case of state of Oklahoma against Ed Smith et al., at this March, 1909, term of district court. Affiant states that in the store of Addison & Ellard in the town of Coalgate, some time in the latter part of February, 1909, he heard the said John Huddard state in regard to Ed Smith and the case against him as follows: 'That Ed Smith is guilty and ought to be hung, and I wish they would get me on the jury. He ought to be hung a hundred feet high and a pile driver tied to his feet.' The affiant further states that he is not related to the defendant, and that he said nothing about this statement to any one until after the trial of the case against the said Ed Smith. Affiant further states that he has lived in what is now called Coal county for the last 15 years. Green Jackson."

In reply to said motion for a new trial and the affidavits thereto attached, the state filed the affidavit of said Juror Huddard, which is as follows:

"John Huddard, after being first duly sworn, according to law, deposes and states upon his oath that he is a resident of Coal county, state of Oklahoma, and that he is one of the jurors that tried the case of the state of Oklahoma against Ed Smith *et al.* at the March, 1909, term of the district court of Coal county, state of Oklahoma. Affiant states that he has read the affidavits made by J. M. Cabe and Green Jackson, and filed with and made a part of the defendant's motion for a new trial, and that said affidavits are false in this: That affiant did not, in the store of Addison & Ellard, in the town of Coalgate, some time in the latter part of February, 1909, or any other time or place, make the statement: 'Ed Smith is guilty and he ought to be hung, and I wish they would get me on the jury. He ought to be hung a hundred feet high and a pile driver tied to his feet,' as alleged in said affidavits. Affiant further deposes and says that he never at any time or place, made to any person or persons any statement like the above statement, or like any part of it, with reference to Ed Smith, or the case against him. [Signed] J. H. Huddard."

These affidavits presented a question of fact which was submitted for determination to the trial court. The judge who tried this case for many years had resided in Coal county and was in a much better condition to determine as to whether the juror or the parties whose affidavits were filed in behalf of the appellant were the most credible. The mere fact that two parties attempted to impeach a juror does not by any means settle the question of credibility as between such parties and the juror. If it did, but few verdicts could be sustained, because in almost any case it would be possible to find two or more persons who would make affidavits impeaching a juror. In passing upon this very question, the Supreme Court of Texas, in the case of *Gilleland v. State,* 44 Tex. 357, said:

"It is true that there are two affidavits in support of the motion and one in rebuttal, but we do not think that the decision of the question presented by the motion should necessarily depend upon the mere number of affidavits on one side over the other."

The question of credibility was one to be determined by the trial court, and, in the absence of a showing that this discretion was abused, it cannot be reviewed here. There is nothing in this record to indicate any abuse of discretion on the part of the trial judge. As was well said by the Assistant Attorney General for the state:

"We think that the best evidence of the fact that the juror never made such a statement is that after his desire, if he had any, was gratified and he sat upon the jury, he returned a verdict assessing the lowest punishment for manslaughter in the first degree."

The state's evidence in this case would have justified a verdict for murder, and we think that the verdict which was returned shows that the jury was not only fair and impartial, but that they treated the appellant with great leniency.

Ninth. The appellant objected to testimony showing that a horse belonging to deceased was hitched near the place where the fatal shooting occurred. This fact constituted a part of the *res gestae* and was just as admissible in evidence as any other fact indicating the circumstances and surroundings of the scene of the difficulty.

We find no error in the record, and the judgment of the lower court is therefore affirmed.

ARMSTRONG and DOYLE, JUDGES, concur.