# STEVENS v. STATE.

No. A-11385.  June 27, 1951.

(232 P. 2d 949.)

Kelly Brown, Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for defendant in error.

BRETT, P. J. The plaintiff in error Kirby Stevens, defendant below, was charged by information in the district court of Haskell county, Oklahoma, with the crime of assault with intent to kill, T. 21, § 652, O. S. A., 1941. More particularly it was alleged that on August 4, 1947, armed with a 45 caliber automatic pistol he shot Olen Smith, city marshal, with intent to kill. To this charge the defendant entered a plea of not guilty by reason of insanity. He was tried on said charge by a jury, convicted and his punishment fixed at one year in the penitentiary.

From a factual standpoint this case presents an unusual situation. Psychiatrically speaking it appears what may have been a clear case of epileptic fugue, scientifically defined as "a disturbance of consciousness in which the patient performs purposeful acts, without remembrance of his actions, after the period of the fugue has passed". On the other hand it may have been the result of a drunken spree. Briefly, the facts, as revealed from the record herein, were as follows, to wit: On the 4th day of August, 1947, the defendant, a veteran of World War II, his father Jim Stevens, and his brother Frankie Stevens had been building a hay rack on a farm out of Stigler. The day was quite hot. The defendant, Kirby Stevens, had not been feeling well all afternoon and complained of his head. They quit work about 4:30 p. m., and came to town for supper. The defendant's sister Faye Harper worked as a waitress at the Chuck Wagon Cafe in Stigler, so they went there for supper. Before going there, however, they stopped at a beer parlor and drank a bottle of beer. There was delay in getting their steaks fixed, and during that time the defendant and his brother Frank went to the beer parlor and Frank drank two bottles of beer and he said Kirby drank about half of a bottle. Returning to the cafe, Kirby's sister asked them what kind of salad they wanted. Kirby told her he would come and help her fix it. She went to the kitchen and got some things out of the ice box and turned around to find Kirby Stevens' gun jammed up next to her. Faye screamed and Frankie Stevens and his father went to the kitchen where Kirby had his 45 automatic pistol drawn on Faye and pointed right at the middle of her chest. The father pushed her away around some boxes and Frankie began to grapple with Kirby for the gun, during which time the pistol was discharged several times, probably as many as five shots. He threw the gun at Frankie Stevens and Smith. Frankie said to Kirby "don't do it, Kirby. For God's sake, put it up". In the scuffle that followed over the gun Jim Stevens finally wrenched the pistol from Kirby's hands. At this point Olen Smith, city marshal, and George Cooper, policeman, who had been called to the cafe, came in and Smith made an attempt to hit Kirby with a blackjack. Frankie Stevens jerked it from his hand and threw it to one side. At this point in the melee Kirby removed Marshal Smith's pistol from the holster and started firing again. Somebody hit Olen Smith on the head and dazed him but no one knew who did it. Kirby emptied Smith's gun, then picked up his own, put another clip into it, and started shooting again. He shot his father, who fell from a wound in the eye and arm. Olen Smith was shot in the chest and arm and the leg. Frankie Stevens was shot in the shoulder. By this time the fight had moved out the back door of the cafe into the alley. The county attorney, Howard Young, had just gone to the postoffice across the street from the cafe. He

heard the shooting. He saw Olen Smith go in then come out bleeding. He attempted to assist him and got him to Jim King's car, and Kirby fired hitting Mr. Young. The bullet hit Young in the spine and he is a permanent cripple from paralysis as a result thereof. Thereafter he shot Mr. Hefley, a bystander, who was in the vicinity of Mr. Howard Young. The defendant was heard to tell his father to get back, and his brother "to get back so he could shoot Olen Smith". He was also heard to say in reference to George Cooper "Stop George, or I will shoot you. If you don't back up, I am going to shoot you". Finally, after his ammunition was exhausted, he was overpowered by Officer Cooper and Mr. Winton who put him in jail. This in substance constitutes a delineation of the chronology of this tragic event. Fortunately none of the parties shot were killed, though some of them suffered permanent bodily injury, particularly Mr. Young.

The state's evidence as to causal factor of Kirby Stevens' conduct was, in substance, revealed by the following evidence: Olen Smith said that from the expression of his eyes he couldn't say he looked insane. It was his first thought Stevens was intoxicated, but whether he was he could not say because he had no proof of it. Stevens, he said, appeared to be as cool as he could be. He thought he heard him say "I want to kill the son of a bitch". George Cooper testified in this regard that the defendant appeared to be drinking, but he couldn't swear he was crazy. Howard Young testified that from his observation of Kirby Stevens, the expression on his face, in the eyes, he looked just like any other drunk at the moment of the alleged crime. He was just on a drunken spree. It was his positive opinion Stevens was drunk. These three witnesses for the state, in connection with the admitted fact the defendant had drunk some beer, constitutes the case as to the causal factors of Stevens' berserk conduct. In this connection it is well to here note that the defendant had no difficulty with any of his victims and harbored no ill will towards any of them.

The evidence on behalf of the defendant as to the factual causes of his strange demeanor and acts on the occasion in question were in substance as follows: Jim Stevens, the father of the defendant, said Frankie said when he came into the kitchen "Dad, he has another blackout". Mr. Jim Stevens testified that he told Mr. Smith and George Cooper when they came into the cafe, and they asked who were out there that he told them "my boys, and one of them has a complete blackout from all accounts". That thereafter he went back and wrestled with him until they got the gun from him, and he then got Mr. Smith's gun and he got shot in the eye and arm. He said Kirby Stevens was like a wild man. He said he did not hear Kirby tell him to get back. He did not know Kirby had the gun he testified. Frankie Stevens testified as to Kirby Stevens' condition, that he had never seen his face look that way before. He said it was white, and a blank expression, and he acted as though he couldn't see. He said he did not recall him saying anything. He further testified they had had nothing to drink that day except the beer. Faye Harper, sister of Kirby Stevens, testified that she had never seen the defendant drunk in her life. She said that when she turned around from the ice box there was a peculiar expression on her brother Kirby's face, a blank look. It frightened her for she had never seen him look that way before. She also stated there was quite a difference in his condition before he went to war and after he returned. He was more nervous after his return from the war. Fannie Stevens, the defendant's mother, testified that before the war Kirby was as good a boy as there was in Stigler. He never had any trouble. He was of good disposition. He graduated from high school there. Following the war she said he was nervous. There were times when it seemed he didn't look at you but just through you. He would get up at times from the dinner table and walk the floor. He didn't eat regular. He was sick after he came back from

the service. After the shooting she went to the jail and Kirby, she testified, was lying on the floor as helpless as a baby, and great drops of sweat were standing out on his face. He didn't seem to understand and didn't answer her when she inquired what was the matter. He had a wild and exhausted look. She had never observed that condition before. They had him put in the Veterans Hospital, not as a patient but for observation, to determine his mental status. Dr. R. D. Turner, chief psychiatrist of the Veterans Hospital at Muskogee, whose eminent qualifications were admitted, testified for the state. His evidence of a highly scientific nature was in substance as follows, to wit. He stated the defendant was referred to Waco Hospital, Waco, Texas, University of Colorado Medical School, Colorado General Hospital and Colorado Psychopathic Hospital. His record shows he was examined first on October 24, 1948, and he was terminated as needing no further treatment on November 24, 1948. The results of all these examinations were that the defendant was suffering from psychoneurosis, expressing itself in anxiety reaction (chronic), manifested by apprehension, battle dreams, dreaming of battle, insomnia and amnesia episodes (loss of memory) during which he re-lived his battle experiences. All the institutions to which he went concluded he suffered a fugue or loss of memory during the episode of violence. The doctor testified that on August 4, 1947, he had such a loss of memory, as well as a loss of judgment. He stated his conduct was automatic and he could not tell the difference from right or wrong. To a hypothetical question of the county attorney he stated the defendant on the occasion involved had no choice. He did not know what he was doing at the time of this episode. These conclusions were reached in connection with a study of the defendant's military record which revealed five years of various military service in the Marine Corps in the Pacific during which time from January 1940 to January 1946 the defendant rose from private to captain. His service took him in combat from Pango Pango to Guadalcanal; from Bougainville to Iwo Jima and elsewhere, fighting Japs, the jungle, the swamps and sickness. His outfit received a Presidential citation. His discharge was, of course, "honorable and satisfactory". The defendant testified that after his discharge from the army on January 25, 1946, he went to college to study geology, got married, and is the father of two children. On the date of this alleged crime he was at home temporarily helping his father on the farm. On August 4, 1947, after working hard on that very hot day he came to town late in the afternoon and on the way in at the edge of town he stopped at a place and had a beer. Thereafter, he said they came on into town to the cafe "The Chuck Wagon", where his sister was a waitress as hereinbefore indicated. After arriving there he decided to drink another beer and went across the street for one; other than that he said he had nothing to drink. Apparently no one knew he was armed with his pistol. He stated he saw Officer Cooper at the cafe. Stevens said he went into the kitchen door and remembered nothing about what had happened until he found himself in the jail lying down. He testified he had no recollection of having shot his father, his brother, Officer Olen Smith, Howard Young and Mr. Hafley, or that he threatened his sister. The defendant testified he had no ill will against Officer Olen Smith, and did not recall having injured him.

On this evidence the defendant was convicted. Among the contentions of merit the defendant makes is, that the verdict of the jury and the judgment of the court is not supported by the evidence. This contention is predicated upon the proposition that the only competent evidence as to the defendant's mental capacity to distinguish right from wrong was the evidence of Dr. Turner, the psychiatrist, who testified that he was in a state of epileptic fugue and did not realize what he was doing and had no recollection of what he had done. On first consideration we were inclined to agree with this contention, but

upon mature analysis from an evidentiary standpoint, which is for the jury to weigh, we were compelled to alter our conclusion. This is a tragic incident in this young man's life. But tragic as it is the defendant helped create it by his precedent drinking. The evidence though weak creates a question of fact for the jury. First, whether he was merely drunk, or in a state of epileptic fugue, second, did he know right from wrong? It is admitted he had drunk at least two bottles of beer. Moreover, the foregoing evidence though weak was to the effect the defendant looked as though he was drunk. Of course, the testimony of Dr. Turner if standing alone would eliminate that condition but it is controverted. And when expert testimony is controverted even by lay witnesses and the jury believes the lay witnesses that is sufficient. It has been held in Kobyluk v. State, 94 Okla. Cr. 73, 231 P. 2d 388.

"Where two psychiatrists testify that in their opinion defendant was insane at the time of the commission of the alleged crime, and no expert witnesses testify to the contrary, but there is ample testimony from lay witnesses concerning the actions, demeanor, and conduct of the accused at the time of the alleged assault from which the jury could reasonably conclude that defendant was sane; the jury was not bound to accept the evidence of the psychiatrists, and their verdict on this disputed issue will be sustained on appeal."

The holding in this case is clearly contra to this contention of the defendant. Moreover on the issue of whether the defendant knew the difference between right from wrong, the foregoing evidence discloses that the defendant was conscious of his father and brother being in a position of danger, which the jury would and did interpret as knowledge of the difference between right and wrong. While we are frank to say that we might have reached a different conclusion from that of the jury, under this record it was the sole and exclusive province of the jury to weigh and determine the question of fact from all the evidence. Moreover in considering the sufficiency of the evidence, the function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis in the evidence on which the jury could reasonably conclude the accused is guilty as charged. Rheuark v. State, 86 Okla. Cr. 409, 193 P. 2d 621. Therefore, the evidence is sufficient to sustain the jury's verdict.

The next proposition which we will consider is the contention that incompetent evidence was admitted against the defendant at the trial. This contention is predicated upon the fact that M. E. Miller testified at the preliminary hearing. He was not present at the trial. The record discloses two attempts to reach him by subpoena without success, first, by personal service and, second, by mail. The trial court over objection held that sufficient showing of diligence had been made to entitle the state to read into the record the transcript of Mr. Miller's evidence taken at the preliminary hearing. The defendant had the right of confrontation, and cross-examination in the preliminary, and therefore could not complain as to this evidence on the grounds he was denied his rights in those regards. Moreover, the record discloses that Mr. Miller's evidence was cumulative. The defendant cites no authority in support of this contention. In light of Saied v. State, 65 Okla. Cr. 124, 83 P. 2d 605, this contention is wholly without merit for therein it was said:

"Where the accused at a former trial or at a preliminary hearing once enjoyed his right to be confronted by a witness against him and had the privilege of cross-examining the witness, if at a subsequent trial, involving the same issues, it satisfactorily appears that the witness has died, become insane, or has permanently left the state without collusion or procurement of either party and that his presence with due diligence cannot be had, or where the witness is sick and unable to testify, or his whereabouts cannot with due diligence be ascertained, a transcript of the testimony of such witness may be introduced as the evidence of such absent witness.

"Having once been confronted with a witness, and having had the right to cross-examine him, the admission of such transcript in evidence is not in violation of the constitutional right of the accused to be confronted with witnesses against him. (Okla. St. Ann. Const. art. 2, § 20.)

"Where the evidence revealed that the witness was absent from the state, and that due diligence had been made to secure his attendance by the issuance of a subpoena to the county of his residence, and his testimony was cumulative, it was not error to permit the reading of his evidence taken at a former trial."

The next contention we will consider is that in relation to instructions of the court Nos. 5, 13, 14 and 14½ given and as to the refusal of the court to give defendant's requested instructions. The defendant cites no authority in support of this contention. As to instructions 5, 13, 14 and 14½, we have carefully examined them and are of the opinion they correctly state the law of the case. Certainly it cannot be said that they did not present the defendant's theory of temporary insanity. Apparently the defendant was satisfied with the instructions at the time of trial for he did not interpose any objection to them or save any exception thereto. Moreover, the defense herein was a special plea of not guilty by reason of insanity and we have held that where the plea is in the nature of a special defense it must be supported both by evidence and requested instructions, in writing, to be available on appeal. Chapman v. State, 84 Okla. Cr. 41, 178 P. 2d 638; Green v. State, 70 Okla. Cr. 228, 105 P. 2d 795, and numerous other cases to the same effect. The defendant's complaint as to his requested instruction was predicated upon the theory that the only competent evidence the jury might consider on the question of insanity was that of Dr. Turner, the psychiatrist, and based thereon requested a directed verdict. Clearly in light of Kobyluk v. State, supra, such an instruction would have been erroneous since the law does not exclude lay evidence and limit the determination of the issue of insanity to psychiatric experts. The contention of the defendant as to the instructions is therefore without merit.

The next contention of the defendant is in relation to Ray Condo, foreman of the jury, being disqualified to sit as a juror by reason of expressed prejudice. This tragic incident occurred on August 4, 1947. On August 5, 1947, Ray Condo, who later became foreman of the jury which tried this case, was employed by Mr. A. L. Nipper in putting up hay in a hay meadow about two miles east of Stigler. Mr. Smith and his son and Mr. Tate were also employed. Mr. Nipper came out on the 5th of August on the job early to tell the men that his stackers were out of commission referring to Frank Kirby and Jim Stevens and said that they would have to suspend operations. There was a general conversation relative to the shooting that occurred the day before and the part that Kirby Stevens, Frank Stevens and Jim Stevens played in the affair. Mr. Harvey Smith and his son Billy Smith on testifying on the amended supplemental motion for new trial remembered the occasion and the general conversation that occurred in the hay meadow with Mr. Condo present, but could not relate the details of the conversation except to state in a general way that the details of the shooting were under discussion. Mr. Nipper testified on cross-examination of the state at the hearing on the amended supplemental motion for new trial that Ray Condo in substance said: "In my opinion they should send the whole bunch to the penitentiary. This business of veterans coming back and shooting up people, they should be sent to prison. They should put a stop to it." Thereafter the case came on for trial and Ray Condo was selected for service on the jury and was selected as foreman. It is admitted in the record that when he was qualified for service on the jury, he was interrogated relative to whether he had heard anything about this case or had expressed an opinion with reference to the guilt or innocence of the defendant.

It was also alleged after conviction in the defendant's amended and supplemental motion for new trial that none of the foregoing facts were known to him at the time of trial. When the amended and supplemental motion for new trial was heard and the foregoing facts developed it appears that Ray Condo was in the courtroom but was not produced as a witness to refute the testimony of Mr. Nipper. To this proof the state interposed a demurrer and the court stated in view of the showing that had been made he would overrule the motion for new trial. To sustain his contention the defendant relies on Mask v. State, 5 Okla. Cr. 191, 113 P. 995. In the Mask case, J. R. Smith, juror, expressed an opinion as to the guilt of the defendant. Therein as here on voir dire examination the juror stated he had no prejudice against the appellant and had expressed no opinions. In the Mask case after the proof of prejudice had been established by other witnesses the juror admitted in substance that. he had made the statements alleged. The trial court overruled the motion for new trial. This court in reversing and remanding the case for a new trial said there was nothing in the record to controvert the charge of prejudice and expressed opinions and that the trial court should have sustained the motion for new trial. The court in so doing, 5 Okla. Cr., at page 193, 113 P. at page 996, said:

"The record further shows by the testimony introduced by the appellant and uncontroverted that the juror was examined on his voir dire and qualified that he had no bias or prejudice against the defendant, and the fact that this juror had these conversations and had been guilty of discussing the case during the progress of the trial was unknown to counsel or the appellant until after the verdict was rendered.

"That this juror was clearly biased and prejudiced against the appellant appears from the admissions in his testimony, quoted supra, although he stated upon his voir dire that he had no bias or prejudice against the appellant. In the case of Scribner v. State, 3 Okla. Cr. 601, 108 P. 422 [35 L.R.A., N.S., 985], this court, in discussing the question of the right to trial before an impartial jury, speaking through Judge Owen, said:

" 'In determining this case, although the evidence may show the defendant guilty beyond all peradventure of a doubt, and sufficient to support a verdict, * * * we must nevertheless set a precedent under ' which a perfectly innocent man may be tried and have preserved to him his constitutional rights of the presumption of innocence and a trial before an impartial jury. If a juror has prejudged the guilt of the defendant before hearing the sworn testimony, then it cannot be said that the defendant had a trial before an impartial jury.'

"See, also, Turner v. State, 4 Okla. Cr. 164, 111 P. 988.

"From a careful examination of this record, we are forced to conclude that the appellant did not have that fair and impartial trial guaranteed to every citizen."

We are of the opinion that the foregoing case is substantially the situation herein involved. The state relies on Horton v. State, 10 Okla. Cr. 294, 136 P. 177, 181. Therein attack was made on jurors Spivey and Wheeler. It was expressly alleged that Spivey was properly interrogated on voir dire examination concerning expressed opinions as to the guilt of the defendant before being chosen as a juror. Spivey took the stand and denied he made any statement concerning the guilt of the defendant. Hence as to Spivey there was a controverted issue of fact presented to the court upon which he could exercise judicial discretion. But as to Wheeler therein there was no proper predicate laid on voir dire examination or at least the court said the record did not support such predicate. In this regard the court said:

"In view of the condition of the record presented, we cannot say that the defendant's complaint is well founded. In order for the defendant to predicate

error on account of the declaration of the juror Wheeler as averred in Rogers' affidavit, it would be necessary for the record affirmatively to show that said juror had been duly examined on voir dire, and had stated under oath that he was not biased or prejudiced, and had not formed or expressed· an opinion as to the guilt or innocence of the defendant. The record contains no recital of such examination. It only appears from the statement of counsel in their brief. It is not even alleged in the verified motion for a new trial. A defendant must exercise all the rights that he has under the statutes to find out whether or not a juror is qualified before he can take advantage, after verdict, of such juror's incompetency or disqualification.

"A defendant cannot sit supinely by and allow disqualified and incompetent jurors to be selected to try him, and then take advantage of his own indifference or negligence, nor can a defendant call upon this court to presume that he asked a juror certain questions, in the absence of a showing in the record that such questions were asked. A known ground of disqualification of a juror before or during the progress of a trial is waived by withholding it or refusing or declining to raise the objection until after verdict. See Queenan v. Territory, 11 Okla. 261, 71 P. 218, 61 L. R. A. 324; Id., 190 U. S. 548, 23 S. Ct. 762, 47 L. Ed. 1175.

"We think it may be safely said that upon principle, if the defendant accepts a juror without availing himself of the right to examine such juror on voir dire, for the purpose of testing his impartiality, or without availing himself of the right to challenge him for cause, and it should be discovered after verdict that he was incompetent by reason of prejudice, the defendant would not be entitled to a new trial on that ground under our statute."

It is obvious that in the Horton case that as to Spivey the court had something upon which to exercise its judicial discretion,·while as to Wheeler there had been no proper predicate laid on voir dire examination as a basis for a challenge as to his qualifications as a juror. Likewise the state relies on Smith v. State, 5 Okla. Cr. 282, 114 P. 350, wherein the defendant's affidavits of Cabe and Jackson alleging prejudicial expressed opinions as to the guilt of the defendant before trial were controverted by the affidavit from the juror under attack, John Hubbard. Therein again we have a controverted issue of fact calling for the exercise of judicial discretion. The state further cites Smith v. State, 19 Okla. Cr. 14, 197 P. 514, in support of its contention that the court did not abuse its discretion herein. In the last cited case 2 barbers made affidavits as to expressed opinions made prior to date of the trial as to juror Wheat but Wheat testified he had expressed no opinions and had no prejudice as to the defendant's guilt. Therein the court had an issue upon which he exercised his judicial discretion. What has been said relative to the foregoing case relied on by the state may ,be said about Vanderslice v. State, 59 Okla. Cr. 192, 57 P. 2d 267, 274, wherein the record failed to disclose a predicate was laid on voir dire examination by questioning jurors as to prejudice or expressed opinions. Therein this court said:

"It has been uniformly held by this court that on matters of discretion the decision of the trial court will not be set aside unless there appears to have been a manifest abuse of the discretion thereof. Spradlin v. State, 13 Okla. Cr. 376, 164 P. 990; Bethel v. State, 8 Okla. Cr. 61, 126 P. 698."

It is apparent that the cases relied on herein by the state on this point are not controlling but that the principle expressed in Mask v. State, supra, is controlling. The very purpose of voir dire examination is to disclose jurors' qualifications as a means of giving the defendant a fair and impartial trial which his constitutional rights guarantee him. Here the juror misled the defendant and caused him to accept a juror, when otherwise he would have been rejected. And added to the injury and as evidence, of the juror's qualities

for leadership, he was elected foreman. His influence may have been the deciding factor in the juryroom, without which a verdict of guilt might never have been returned. He may have led the forces in the juryroom in favor of conviction from the very start and·been the outstanding factor in weighing the scales of injustice against the defendant. In any event, the jury did not believe too strongly in the defendant's guilt for they gave him only a year in the penitentiary. It may have been the foreman's prejudice that shifted the scales in the direction of a verdict of guilty. Regardless of his guilt or innocence, the defendant was entitled to that fair and impartial trial within the contemplation of law. In Tegeler v. State, 9 Okla. Cr. 138, 130 P. 1164, 1167, we find the following apropos expressions relative to what constitutes a fair and impartial juror:

"Section 28, Williams' Const. of Okla., among other things, provides:

" 'In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed.'

"These two sections of our Constitution constitute the paramount law which must control in the selection of juries and the conduct of all criminal trials in the state of Oklahoma. Any act of the Legislature with reference to the conduct of criminal cases, and the qualifications of jurors must be construed in connection with and in subordination to * * * provisions of our Constitution. Justice must be administered without prejudice, and the juries in criminal cases must be impartial in the courts of Oklahoma, is the express and imperative mandate of our Constitution, and by this mandate we are bound, it matters not what our individual views may be or what any other court may have decided. This is the end of the matter, and shuts out all discussion so far as the courts of Oklahoma are concerned. The words 'prejudice' and 'impartial' have no narrow, technical meaning in a legal sense, but are words commonly used in the everyday affairs of life, and their meaning is well understood by all persons of ordinary intelligence. Webster's New International Dictionary defines 'prejudice' as 'an opinion or judgment formed beforehand, or without due examination; a prejudgment.' It therefore necessarily follows from this that justice is not administered without prejudice where the jury have prejudged the matters of fact submitted to them for determination. Webster's New International Dictionary defines 'impartial' as 'not favoring one more than another; treating all alike; unbiased, equitable, fair, and just.' It therefore necessarily follows that, if a juror favors one side in a criminal case more than the other, such juror is not 'impartial.'

"This interpretation of the two provisions of the Constitution above quoted is not only in harmony with common sense and justice, but it is supported by the great weight of legal authority."

Further on in speaking of the constitutional guaranty of the right to trial by an impartial jury, this court said:

" 'The constitutional guaranty that in all criminal prosecutions the accused shall have the right of trial by an impartial jury means a jury not biased in favor of one party more than another; indifferent; unprejudiced; disinterested. This right to have an impartial jury cannot be abridged, and therefore the body of the triers should be composed of men indifferent between the parties, and otherwise capable of discharging the duty of jurors. Whether in the practical administration of justice the right is infringed is necessarily a judicial question, and whether, in a particular case, a proposed juror has the state of mind which will render him impartial, is a question of fact which it is the duty of the court trying the case to decide.' Curry v. State, 5 Neb. 412, 413."

We cannot say in the case at bar that the defendant herein received what the law affords him. For certainly on the very face of the facts herein involved

the defendant's evidence in support of the charge of prejudice and expressed opinion was valid. Here the only evidence before the court was that in support of prejudice and expressed opinion. There was nothing else before the court on the amended and supplemental motion for new trial as to juror Condo. We can only presume it would have taken evidence of the strongest character to overcome Condo's fixed and expressed opinion of guilt. Therefore Condo was not a qualified juror. The state not only did not counteract the defendant's evidence but admitted its truthfulness by its demurrer. In Tegeler v. State, supra, this court defined what is meant by an abuse of discretion as follows:

"By abuse of discretion is meant a clearly erroneous conclusion and judgment: one that is clearly against the logic and effect of the facts presented in support of and against the application. Whatever the decisions in other states may be, this is not an open question in Oklahoma. See Starr v. State, 5 Okla. Cr. 440, 115 P. 356; Turner v. State, 4 Okla. Cr. 164, 111 P. 988; Black v. State, 3 Okla. Cr. 547, 107 P. 524; Johnson v. State, 1 Okla. Cr. 321, 97 P. 1059, 18 Ann. Cas. 300."

The trial court's holding herein under the foregoing rule and the record made herein was clearly an abuse of discretion. As a matter of fact, the holding of the trial court was not supported by a scintilla of evidence. The situation herewith presented is somewhat analogous to Rawls v. State, 86 Okla. Cr. 119, 190 P. 2d 159, 160, wherein a change of venue was sought supported by 100 affidavits. Though not controverted by the state the trial court overruled the motion. We reversed that case and therein we said:

"An 'abuse of discretion' by the court in passing on a motion for change of venue means a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented in support of and against the application.

"To say that an application rests in the discretion of trial court does not mean that it may be granted or refused at the mere will or pleasure of the judge, but he is to exercise a sound judicial judgment in the interest of justice and prudence."

In the body of the opinion at page 135 of 86 Okla. Cr., at page 167 of 190 P. 2d, we said:

"It is our conclusion, based upon the above authorities, that the defendant made a prima facie showing in his motion for change of venue, which in the absence of any counter affidavits or counter showing of some nature was sufficient on its face to entitle him to a change of venue, and that the action of the court in overruling the motion without requiring some showing from the County Attorney was arbitrary, oppressive and constituted an abuse of discretion."

Likewise the situation herein presented constitutes a clear abuse of judicial discretion. Other questions of no importance were also raised. The trial court erred in not sustaining the defendant's amended supplemental motion, and upon this ground alone this case must be reversed and remanded for a new trial. The defendant has raised another objection relative to the misconduct of the county attorney, but since such alleged error will not likely occur in the new trial, we will not consider it here. For all the above and foregoing reasons, the judgment and sentence herein imposed is accordingly reversed, vacated and set aside and this cause remanded for a new trial.

JONES and POWELL, JJ., concur.