[No. 17692. Department Two. August 31, 1923.]

THE STATE OF WASHINGTON, *Respondent*, v. T. H. RILEY
*et al., Appellants.*[1]

JURY (52)—COMPETENCY—PREJUDICE—INFLICTION OF DEATH PENALTY. Under the general rule, and also under Rem. Comp. Stat., § 2142, jurors in a capital case whose opinions preclude them from finding a defendant guilty of an offense punishable by death are incompetent to sit and should be excluded, notwithstanding the later enactment of Id., § 2392, allowing a jury to determine whether the death penalty shall be inflicted.

CRIMINAL LAW (224)—TRIAL—RECEPTION OF EVIDENCE—COMPELLING CALLING OF WITNESS. In a murder case, it is not error to exclude defendants' offer of proof to the effect that witnesses of the homicide refused to discuss the case with defendants' witness sent to investigate the facts, and no unfavorable inference can be drawn from the fact that the state failed to produce such witnesses in court.

CRIMINAL LAW (119)—EVIDENCE (66-1)—COMPETENCY—RESULT OF TESTS—EXPERIMENTS BEFORE JURY. Upon an issue as to the identity

[1]Reported in 218 Pac. 238.

of masked men committing a robbery and murder, it is not error to exclude offers of experiments in the presence of the jury tending to test the ability of witnesses to identify a man dressed and masked as the perpetrators of the crime were dressed and masked, where there was no abuse of the discretion vested in the trial judge, who might have concluded that the conditions were not accurately reproduced.

PEMBERTON, J., dissents.

Appeal from a judgment of the superior court for Clallam county, Ralston, J., entered July 15, 1922, upon a trial and conviction of murder in the first degree. Affirmed.

*G. F. Vanderveer,* for appellants.

*John M. Wilson,* for respondent.

PARKER, J.—The defendants, Riley and Butt, were charged by information, filed in the superior court for Clallam county, with the crime of murder in the first degree, as being committed by them in that county on March 25, 1922, while they were jointly engaged in the commission of the crime of robbery. Their trial jointly in that court, sitting with a jury, resulted in verdicts of guilty as charged being rendered against both of them, and the determining of the punishment both of them shall suffer to be life imprisonment. Judgments and sentences were thereafter accordingly rendered by the trial court, from which the defendants have both appealed to this court.

The robbery and murder in question were committed in the nighttime, between the hours of eight and nine o'clock in the evening of March 25, 1922, in the recreation hall of the Discovery Bay Logging Company, a hall wherein the employees of that company were accustomed to gather in the evenings and indulge in card games and other recreation. At the time in question, there were some fifty men assembled in the hall, when

two masked robbers, armed each with two revolvers, entered the door and ordered everybody to raise their hands and face the wall. One of the robbers then seated himself on a box near the door and covered the crowd with his two revolvers, while the second robber searched the men and took money and other property from them aggregating several hundred dollars in value. While this was in progress, covering a period of ten to twenty minutes, a man outside the building, who afterwards became a witness for the state, accidentally saw through the window what was going on in the hall, when he hurriedly secured a shotgun, and, coming again to the window, fired through it at the robber stationed on the inside at the doorway. Immediately that robber fired several shots toward the window, one of which killed Ray Leight, who was standing near the window facing the wall as he had been ordered. This shot, resulting in Leight's death, constitutes the murder for which appellants were tried and convicted. As to the robbery and the murder being thus committed by the two masked men then in the hall, the evidence is all but conclusive. Indeed, counsel for the defendants have not contended to the contrary. The only serious contention as to the facts, made in appellants' behalf, is as to the identity of the defendants as the two robbers who so committed the robbery and murder; and even as to this question of fact it is not argued but that the evidence was such as to warrant the submission of that question to the jury.

It is first contended in behalf of the appellants that the trial court erred to their prejudice in sustaining challenges made by the prosecuting attorney to several jurors upon the ground that they each were so conscientiously opposed to the death penalty that they would not, under any circumstances, vote for the in-

fliction of such penalty. It is sufficient for present purposes that we quote from the examination and answers of one of these jurors touching his qualifications as a juror, since the examination and answers of the other jurors so challenged and rejected are in substance the same. The juror was asked and answered as follows:

"Q. If, in your judgment, the circumstances of a case should warrant it, could you vote to hang a man as a penalty for murder? A. No, sir. Q. Under no circumstances? A. No, sir. Q. No matter what the evidence might show? A. No, sir. Q. Nor how aggravated the case? A. I could not."

Section 2142, Rem. Comp. Stat. [P. C. § 9369], touching the qualifications of jurors in the trial of an offense which may be punishable by death, reads as follows:

"No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense."

This was enacted as a part of the statute law of this state at a time when murder in the first degree was punishable by death only, the court being required as a matter of law to render a judgment accordingly upon a verdict of a jury being returned finding an accused guilty of murder in the first degree. The legislature of 1919 passed an amendatory act defining murder in the first degree and prescribing the punishment therefor, reading in part as follows:

"Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty

shall be inflicted; and if such special verdict is in the affirmative, the penalty shall be death, otherwise, it shall be as herein provided." Laws of 1919, p. 273; § 2392, Rem. Comp. Stat. [P. C. § 8997].

The argument of counsel for appellants seems to proceed, as we understand him, upon the theory that, since the death penalty does not now, as a matter of law, follow a verdict of guilty of murder in the first degree, neither the statutory rule above quoted nor the general rule of the same import in the absence of statute, has any application touching the qualifications of jurors to sit in the trial of a charge of murder in the first degree. Our decision in *State v. Mahoney,* 120 Wash. 633, 208 Pac. 37, seems to be conclusive against such contention. We there said:

"The fourteenth and fifteenth assignments raise objections made by appellant to questions asked jurors by the state as to their prejudice against the infliction of the death penalty. We think it was the duty of the state to secure for jurors those who were not opposed to the infliction of the death penalty in a proper case, in view of our statute permitting this form of punishment."

In view of that somewhat summary disposition of the question, prompted by the then somewhat perfunctory manner of its presentation, we here notice the question in the light of the authorities which, we think, by their overwhelming weight, lead to the same conclusion, whether the question be decided in the light of § 2142, Rem. Comp. Stat., above quoted, or the general rule of the same import, apparently universally followed by the courts of this country in the absence of statute. In the text of 24 Cyc. 307, supported by many decisions there cited, we read:

"It is now well settled that in capital cases the state may challenge a juror for cause, who states that he

has conscientious scruples against finding a prisoner guilty where the punishment is death, and while this rule is uniformly followed in the absence of any statute, in some cases the statutes now expressly so provide, or provide that persons having such scruples shall not be permitted or compelled to serve. The same rule applies, although under the statutes the jury are permitted to bring in a verdict of guilty 'without capital punishment,' or substitute imprisonment for the death penalty.''

Looking to the reason of the rule, we find it well stated by the supreme court of Indiana as early as 1850 in *Gross v. State,* 2 Cart. (Ind.) 329. After noticing prior decisions having to do with the question in connection with the law making murder in the first degree punishable only by death, the court holds the rule to be of the same force applicable to the state's then statutory law making such offense punishable by death or life imprisonment as the jury may determine; observing as follows:

''It is contended that these authorities are not applicable to the present case, inasmuch as by an act passed in 1846, a discretionary power is given to the jury to prescribe the punishment of death or of imprisonment for life, for the crime of murder in the first degree.

''The reason why a juror is considered disqualified by such scruples is, that they would prevent him from performing his part as such juror in the due administration of the law. We think this reason applies with equal force, whether the law prescribes the single punishment of death, or invests the jury with a discretionary power to inflict that punishment or another. If in the one case his scruples would not permit him to render a verdict in accordance with the law, in the other they would not permit him to exercise the discretionary power with which he is invested, and which it is essential he should exercise to carry out the spirit and intention of the law.''

The same view is tersely expressed by the supreme court of Arizona in *Leigh v. Territory*, 10 Ariz. 129, 85 Pac. 948, as follows:

"The rule only forces a defendant to accept a jury free to impose either the death penalty or imprisonment for life; and the territory has the right to a jury that will impose the graver penalty if warranted by the circumstances, untrammeled by any conscientious opinions against its infliction."

In *Demato v. People*, 49 Colo. 147, 111 Pac. 703, Ann. Cas. 1912A 783, 35 L. R. A. (N. S.) 621, the supreme court of Colorado similarly disposed of the question in the light of the statute of that state, making first degree murder punishable by either death or life imprisonment as the jury may determine; observing as follows:

"The juror's oath prescribes his duty. By the obligation thus imposed, he is to well and truly try the issues joined and a true verdict render according to the law and the evidence. The law-making power of the state, namely, the general assembly, has provided that capital punishment may be inflicted for murder in the first degree, when the jury finding such verdict so determines, or life imprisonment, in the discretion of the jury. In other words, under the law, it is the bounden duty of the jury convicting one of the crime of murder in the first degree to exercise their discretion in fixing the penalty to be imposed. To follow and uphold the law is the duty of courts and juries. Manifestly, one who says he would not exercise the discretion vested in him by law, by declaring under oath that he would not fix the death penalty in a proper case, cannot discharge the duties which his oath prescribes. It would certainly be an anomaly to impose upon a juror the obligation of an oath which he says he will disregard. Clearly, such a person is disqualified to act as a juror in a murder case, for the reason that his attitude on the subject of capital punishment would prevent him from performing his duty

in the due administration of the law. He would not
carry into effect the whole law, and therefore would
not stand indifferent between the state and the ac-
cused. *State v. Melvin,* 11 La. Ann. 535; *State v.
Stewart,* 45 La. Ann. 1164; *People v. Majors,* 65 Cal.
138; *Driskill v. State,* 7 Ind. 338; *Stratton v. The
People,* 5 Colo. 276; *Spain v. State,* 59 Miss. 19; *Rhea
v. State,* 63 Neb. 461; *People v. Tanner,* 2 Cal. 257;
*Gross v. State,* 2 Ind. 329; *Greenley v. State,* 60 Ind.
141.''

The only decisions coming to our notice which may
be said to lend some support to the contrary view are
*State v. Lee,* 91 Iowa 499, 60 N. W. 119, and *State v.
Garrington,* 11 S. D. 178, 76 N. W. 326. The Iowa case
seems to have been decided upon the peculiar statutes
of that state, which specified fifteen grounds of chal-
lenge for cause; the court seeming to take the view
that these specified statutory grounds of challenge ex-
cluded all other grounds, and the ground here in ques-
tion was not one of the grounds so specified, though
the court held that it was proper that a juror be ex-
amined touching his views upon capital punishment
incident to the exercise of a peremptory challenge by
the prosecution. In the South Dakota case, the court
expressed the opinion that a juror's conscientious op-
position to capital punishment would not be cause for
challenge, though holding that the questioning of him
touching his views on that subject was proper, incident
to the exercise of a peremptory challenge by the prose-
cution. We note that the claim of error there made
was not the sustaining of a challenge by the trial court
for cause, but evidently the permitting by the trial
court of the juror being so questioned by the prosecu-
tion, since the trial court overruled the challenge for
cause. We are of the opinion that this claim of error
made by counsel in behalf of appellants is not well

founded, and that the trial court did not err in sustaining the challenge to the jurors, made by the prosecuting attorney upon the ground that their examination showed them to be so opposed to capital punishment as to prevent them from inflicting the death penalty under any circumstances.

It is next contended in behalf of appellants that the trial court erred to their prejudice in rejecting offers of proof made by their counsel of his efforts in their behalf to interview the men individually who were in the recreation hall at the time in question. It appears that the prosecution called as witnesses only seventeen of the some fifty men present at the time in question. These offers of proof manifestly were made upon the theory that such proof would rebut any inference that might arise against appellants because of their counsel's failure to produce at the trial, as witnesses, the other men present at the time in question who were not produced by the state as witnesses; that is, any inference that might arise suggesting that appellants did not produce these other men as witnesses because they would be presumably witnesses unfavorable to appellants. To the end, that we have before us the exact nature of these offers, we quote them as stated by their counsel in his brief:

" 'I offer to prove by the witness A. L. Carpenter that on or about the 5th day of May, at Maynard's, while on his way to Discovery Bay Logging Company's Camp, he met the storekeeper, Ryan, I believe, a state witness, and informed him that he was from my office and had come up to investigate this case and to talk to the witnesses; and Mr. Ryan replied to him that of course he could go to the camp if he wanted to, but he didn't think that any of the witnesses there—any man there, wanted to talk to him; that the men had pretty well made up their minds that these were the right men.'

"An objection having been sustained to this offer, the following additional offer was made:

" 'That thereupon he (Carpenter) proceeded to the camp where the shooting occurred and there saw the witness Sykes, who was at the time acting as store-keeper in Mr. Ryan's office, and repeated to him that he was from my office and that he had come up to investigate the case in my behalf, and that the witness then informed him, in substance, that he did not care to talk to him, that whatever he knew or had to say about the matter would be said in court only.'

"This offer having been likewise rejected, a third additional offer was made:

" 'That thereafter he (Carpenter) remained in the camp for either three or four days and made every effort to search out and interview all the employes who had been present in the recreation hall on the night of the shooting and who might be witnesses on behalf of the defendants; but that wherever he went among them he was confronted with cool reluctance in all cases and in most cases positive refusal to talk to him or discuss the case at all.' "

Now these, it is plain, are not offers to show that appellants' counsel did not know who all these potential witnesses were, or that he could not effectually have subpoenaed or brought into court everyone of them. It seems to us that, if any such inference might arise against appellants, as their counsel seeks by these offers of proof to rebut, there would be in any event the burden resting upon appellants or their counsel to show why these men could not be produced in court as witnesses. No proof of such nature was offered to be made, but only an offer, in substance, to prove that appellants' counsel could not successfully interview the men present in the recreation hall at the time in question, and that the men were unwilling to discuss the case with appellants' counsel. It seems quite plain to us that such proof could have no bearing whatever

upon any issue in the case nor touch any unfavorable inference that might arise against appellants because of their failure to produce these men as witnesses. These observations, we think, render it unnecessary for us to discuss the question of whether or not the failure of appellants or their counsel to produce these witnesses in court would give rise to any such unfavorable inference against appellants as would warrant the court permitting appellants to rebut such inference, though we are strongly inclined to the view that no such inference would arise, since there is nothing here shown that suggests any duty resting upon appellants to produce any of these men as witnesses to avoid any unfavorable inference arising against appellants from the mere absence of such witnesses.

It is finally contended in behalf of appellants that the trial court erred to their prejudice in rejecting offers of experiments or tests, in the presence of the jury, of the ability of certain of the state's witnesses to identify a man dressed and masked as the robbers were. In addition to evidence of some of the property, taken by the robbers at the time of the commission of the crime, being found in their possession under circumstances tending strongly to identify them as the robbers, several of the state's witnesses who were present in the recreation hall at the time, identified the appellants as the robbers with varying degrees of certainty. While one of these state's witnesses who had so testified was being cross-examined, counsel for appellants caused to come into the courtroom a man, a personal acquaintance, as he claimed, of the witness, dressed and masked as the witness had testified the robbers were dressed and masked. The court immediately had the man ejected from the court-

room before the witness had opportunity to observe him closely. Then the following occurred:

"Mr. Vanderveer: I would like to have him brought in. I want to see if this witness can identify him.

"The Court: I will not allow that.

"Mr. Vanderveer: Let the record show that I now offer to produce a man masked as this witness has testified the defendant was masked, a man whom I know he has seen, in order that we may here in the presence of the jury test his ability to identify him."

This offer was by the court rejected. Similar offers were made to so test the ability of other witnesses to identify the defendants as the robbers, and rejected by the court.

A number of the decisions of the courts are cited and relied upon by counsel for appellants in support of his contention that the court erred to the prejudice of the appellants in rejecting these offers. The decisions so relied upon by counsel all have to do with offers of proof of tests made out of court and out of the presence of the jury. These decisions, also, have to do with problems which were demonstrable with a considerable degree of certainty, not only as to the possibility of reproducing accurately and fully the conditions attending the original event, but also as to the nature of the problems involved, in that they were all of such nature that the result of the tests would almost certainly be viewed alike by all persons possessing normal faculties. For instance, *Amsbary v. Grays Harbor R. & L. Co.,* 78 Wash. 379, 139 Pac. 46, 8 A. L. R. 1, wherein there was involved evidence of a test as to the distance at which a motorman could have seen a man, that is, identify an object as a man, but not as any particular man, on the track ahead of the car he was running. The same problem in substance was involved in *Griggs v. Dunham,* 213 Mo.

App. 459, 204 S. W. 573; *Gulf, C. & S. F. R. Co. v. Whitfield*, 206 S. W. (Tex. Civ. App.) 380, and *Griggs v. Kansas City R. Co.*, 228 S. W. (Mo.) 508. Also *Kohlhagen v. Cardwell*, 93 Ore. 610, 184 Pac. 261, 8 A. L. R. 11, wherein there was involved the number of hogs of a certain size that could be loaded in a wagon of a certain size. Also *Smith v. State*, 2 Ohio St. 511, wherein there was involved the effect of the flash of the fire of a pistol as to it affording sufficient light to enable one person to see another person present. These are the only decisions cited by counsel for appellants in support of this contention. Many other decisions of this nature might have been cited having to do with experiments or tests the result of which would, with a high degree of certainty, prove the truth or falsity of a given claim as to what occurred or could occur under certain physical conditions. But we think the tests here sought to be made in the presence of the jury were a seeking to prove a fact, towit, the inability of the witnesses to identify appellants as the robbers, attended by too many uncertain elements to be of assistance to the jury. It was as likely to mislead as to enlighten the jury as to the witnesses' ability to identify appellants as the robbers.

In any event, it seems to us we cannot say that the trial court, in excluding the offer of such tests, abused its discretion. The general rule seems to be that, as to tests made, even out of court and out of the presence of the jury, it is largely a matter of discretion with the trial court as to whether or not evidence of them should be admitted upon the trial. It seems to us that the trial court should be possessed of even a wider discretion in determining whether or not it will permit tests or experiments to be made in the presence of the jury. In this case, we think the

trial court might well have concluded, as it evidently did, that the conditions under which the witnesses saw the robbers could not be reproduced in such manner as to make the proposed tests in the presence of the jury proper, in view of the manifest impossibility of reproducing with sufficient accuracy all of the conditions which might have caused the witnesses to identify appellants as the robbers. Those conditions manifestly were not all physical. What one may sense in the way of identifying an assailant threatening his life is quite different from what he may sense under other conditions.

We are of the opinion that the record before us discloses no error prejudicial to the rights of appellants. The judgments are affirmed.

MAIN, C. J., FULLERTON, and TOLMAN, JJ.. concur.
PEMBERTON, J., dissents.