UNITED STATES v. PUFF.

No. 136, Docket 22906.

United States Court of Appeals Second Circuit.

Argued Jan. 11 and 12, 1954.

Decided March 3, 1954.

Writ of Certiorari Denied May 3, 1954.

See 74 S.Ct. 713.

Federal jurisdiction was invoked under 18 U.S.C.A. § 1114 which provides as follows:

"§ 1114. Protection of officers and employees of the United States

"Whoever kills * * * any officer or employee of the Federal Bureau of Investigation of the Department of Justice * * * while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under sections 1111 and 1112 of this title."

The indictment charging murder in the first degree was laid on 18 U.S.C.A. § 1111 which reads as follows:

"§ 1111. Murder

"(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

"Any other murder is murder in the second degree.

"(b) Within the special maritime and territorial jurisdiction of the United States,

"Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life;

"Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life."

The verdict of guilty of murder in the first degree was not qualified by the addition of "without capital punishment" as it might have been under Section 1111. The court thereupon imposed the sentence of death.

At the trial it was conceded that the deceased, Joseph J. Brock, on July 26, 1952 was an agent of the Federal Bureau of Investigation of the Department of Justice of the United States and that he died as the result of gunshot wounds inflicted upon him on that date. The defendant called no witnesses and did not himself take the stand. The Government offered evidence tending to show the following facts:

On July 20, 1952 the defendant and a woman registered in a certain hotel in New York City under the alias of Mr. and Mrs. J. Burns and were assigned room 603. Later that day another couple registered under the name of Mr. and Mrs. John Hansen at the same hotel and were assigned room 904. On July 25th the defendant checked out of room 603. On Saturday morning, July 26th, when the Hansens were still registered in room 904, the deceased was sent to the hotel in charge of a squad of F.B.I. agents to arrest the defendant on an outstanding warrant of arrest. On Saturday, July 26th, after the agents had arrived at the hotel and while Mrs. Burns and Mrs. Hansen were in room 904 the defendant entered the hotel and after calling room 904 on the house phone in the main lobby went up in the elevator. Shortly thereafter a woman telephoned the hotel desk from room 904 asking that a boy be sent up for the luggage as they were checking out.

Thereupon the agents took stations on the ground floor to accomplish the defendant's arrest when he should emerge

from the elevator. The decedent dressed in sports garb, with his official badge not exposed, took a station in a small back hall on the ground floor of the hotel separated from the lobby only by a glass door whence he could see the elevator in the lobby. A few seconds before the crime he was crouched in the corner of the hall nearest the elevator door and watching it through the glass door with a drawn gun in his hand.

In this setting, the defendant emerged not from the elevator, as the deceased had obviously expected but from the stairs which led to the hall separated therefrom by a metal fire door opening into the hall which had been closed when the deceased had taken his station. At the time the defendant had a loaded gun with a dozen spare cartridges. Of the events that then occurred in the hall, there was no direct testimony from eye-witnesses. It is certain that at least four shots were fired by the defendant's gun, three of which entered the body of the deceased. Five shots were fired by the deceased's gun none of which took effect.

After this gunfire in the back hall, the defendant burst into the hotel lobby with the deceased's gun in his right hand and his own gun in his left hand; ran in a zig-zag course through the lobby exchanging one round of shots with another agent there stationed, neither of which took effect, and emerged from the front door of the hotel still with a gun in each hand, shot at another agent who, with others were converging on the hotel from the street, and was finally brought down by a shot in the leg from one of these agents. His arrest was then accomplished without further violence.

At the trial, the lines of defense chiefly relied on were lack of premeditation and self-defense.

Eugene H. Nickerson, and Abraham J. Gellinoff, New York City (Hale, Stimson, Russell & Nickerson, Lawrence L. Stentzel, II, Gershman & Gellinoff, New York City, of counsel), attorneys for defendant-appellant.

J. Edward Lumbard, United States Atty. for the Southern District of New York, New York City (George H. Bailey and James B. Kilsheimer, III, Asst. United States Attys., New York City, of counsel), attorneys for the appellee.

Before FRANK, MEDINA and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

■ The defendant claims error in the admission of the testimony of an employee of the Prairie Village National Bank of Kansas that she had seen the defendant, whom she identified in open court, in the Bank on November 23, 1951, with a rifle when "dressed in white overalls and his hunting cap pulled down over the brow and his ears stuck up under the cap" actively participating in the robbery of the Bank. A preliminary objection was overruled and the testimony was received without specific limitation to any particular issue in the case. As the testimony proceeded a renewal of the objection was overruled with a caution by the Judge to the District Attorney in the hearing of the jury "since the defendant is not on trial at this time for this alleged robbery and the jury is not here to determine his guilt or innocence of that robbery, and this evidence is being received for a very limited purpose, that your inquiry into these matters be not too extensive." The testimony, all of which was reasonably restrained, was then speedily concluded and defendant's counsel moved to strike and for mistrial. These motions were denied, and a motion for a special instruction that the jury be instructed to disregard it was denied "at this time." The government then rested its case.

Thereafter, in the absence of the jury, the defendant again moved for mistrial on the ground that the testimony as to the bank robbery was irrelevant and prejudicial because of its inflammatory effect. This motion also was denied and

in the colloquy which ensued the Judge pointed out that the testimony had been admitted on the question of motive which in turn bore on the issue of premeditation and the defendant's claim of self-defense.

These rulings we hold to have been in all respects proper. Certainly it was admissible for the government to prove that the defendant had a motive to shoot his way out of the hotel in which he found himself entrapped: such a motive had a natural tendency both to prove premeditation and to negate a possible contention that the defendant shot in self-defense. The existence of such a motive depended upon proof of the defendant's knowledge that he was wanted by the authorities for a serious crime: otherwise incentive would be lacking for adopting such a drastic means of effectuating escape. And testimony that the defendant had actually participated in a bank robbery was competent for its tendency to prove that at the time of the shooting he knew that he was wanted. The testimony that he participated in the earlier robbery without effective disguise afforded some ground for inference that he knew, or at least feared, that he could be identified as a participant. Up to this time in the trial there had been no concession by the defense that the defendant at the time of the shooting knew that he was wanted for a felony. And as the judge pointed out there was "no way of bringing it home except to show that by reason of acts of the defendant he knew or had reason to know that he was on July 26, 1952, sought as a fugitive from justice."

It thus appearing that this testimony had probative force on the defendant's motive which in turn had powerful bearing on the contested issues of premeditation and of self-defense, the case here must be distinguished from those in which proof of prior crime has no probative effect on any open issue, such as Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077; United States v. Sager, 2 Cir., 49 F.2d 725; and Hargett v. United States, 5 Cir., 183 F.2d 859. Instead, the case here is governed by doctrine recognized in such cases as United States v. Pugliese, 2 Cir., 153 F.2d 497; United States v. Glory Blouse & Sportswear Co., 2 Cir., 158 F.2d 880.

In United States v. Krulewitch, 2 Cir., 145 F.2d 76, 80, 156 A.L.R. 337, it was recognized that evidence of prior misconduct by the defendant had been improperly admitted because, although rationally relevant, its "cost" was "more than commensurate with the dangers it involved" in that "it greatly tended to muddle the jury, and to lead them to convict the accused because he was in general so loathsome." The rulings here were not inconsistent with that doctrine. For here motive was highly important for its bearing on the issues of self-defense and premeditation, upon the proof of which the possibility of a death sentence depended. It can fairly be said that the exclusion of this testimony might have been of dear "cost" to the attainment of justice. It was not until the summation that it was conceded that the defendant entered the hall knowing that he was wanted. It is highly likely that without this evidence the concession would not have been made even then. And even then it was not conceded that the defendant was wanted *for a serious crime,*—a fact which would bear heavily on the issue of motive. On the other side of the equation posed by the Krulewitch case, everything possible was done to prevent confusion and improper prejudice from the testimony. Thus the only reference to this testimony in the summation of the District Attorney was the following:

> "As he got down to the fourth floor landing, this man, who under the name of Gerhard Puff was wanted in Kansas for a serious crime, did he not give some thought to what his plan was, and that was to escape this place, and to do it by whatever means were necessary? That is what he had the gun for, and people do not carry guns unless

they have some idea they might need to use them.

"We have shown in this case and I think it is only fair to state the limited purpose of it, enough of the circumstances that the Johnson County Bank and Trust Company to show that the man that was wanted was this man, this Puff, and he, therefore, must have known that he was the man that was wanted, and that it was for a serious crime that he was wanted, one for which the punishment might well be such that a man would take some risks in escaping, that he would go down the stairs and carry a gun with him if he thought the F.B.I. might be closing in."

And the judge's charge to the point was confined to the following:

"You have heard testimony concerning the robbery of November 23, 1952, of the Johnson County National Bank and Trust Company of Prairie Village, Kansas, and that the defendant was suspected of participation in the commission of this crime, and that a warrant for the arrest of the defendant for this alleged participation issued from the United States District Court in the State of Kansas. It is the Government's contention, and with what force and effect it is for you to say, that proof of this robbery and of the defendant's alleged participation in it, if you believe that he did so participate, will tend to establish that at the time the defendant is alleged to have unlawfully fired the fatal shots he did so intentionally and with a purpose to evade arrest for the commission of that robbery. This testimony was received, not for the purpose of determining whether in fact the defendant did commit this robbery, for he is not on trial for that crime, but solely and for the very limited purpose of tending to establish a motive on the part of the defendant for the alleged unlawful shooting

and killing of the deceased, as such motive bears on his intent. This testimony may be considered by you, if you believe it, and given such weight as you deem it entitled to receive, as a circumstance bearing upon the defendant's motive at the time of the alleged unlawful shooting and killing. It is only on this question of motive that you may consider this testimony. You may not consider it for any other purpose, for the fact that the defendant may or may not be guilty of another crime is no evidence of the fact of his guilt of the crime for which he is now on trial. You will come to a consideration of defendant's motive only if you have been first convinced beyond a reasonable doubt that the defendant did in fact unlawfully assault, shoot and kill the deceased."

Nor is there room for serious contention that the jury relied upon the evidence of the bank robbery as proof that the defendant shot the deceased. Quite apart from the concession in the defendant's summation, the fact that defendant shot the deceased was established by an overwhelming weight of evidence. Altogether it is abundantly clear that the only effect of the testimony objected to was for its impact on the issue of premeditation and motive for which it was properly received. If the defendant was prejudiced by the admission of the testimony the prejudice derived not from error but as the inevitable consequence of admissible testimony as to his own state of mind as evidenced by his own prior conduct. We reiterate our conclusion that this claim of error has not been sustained.

The defendant upon appeal also claims as error the admission of an indictment filed in the United States District Court for the District of Kansas on January 30, 1952, charging the defendant and another with the robbery of the Prairie Village Bank of Kansas on or about November 23, 1951. To the admission of this document the defendant had also

interposed timely objection. This indictment was offered through the Clerk of the Kansas court who was first asked if there was on file in the Kansas court an indictment charging the defendant "with the commission of felony in violation of the laws of the United States." The defendant objected on the ground that the question was immaterial, irrelevant and inflammatory. The objection was overruled and the witness answered "there is an indictment on file in our office." The witness then without the intervention of another objection testified that the indictment was filed on January 30, 1952, that a warrant issued pursuant to the indictment on January 31, 1952, and that the warrant was outstanding on July 26, 1952. She was then asked whether the indictment and the complaint charged the commission of an offense on the same date. To this an objection was sustained "as to form." The district attorney then asked "does that indictment charge that an offense was committed on a certain date in the District of Kansas?" The judge in line with his prior ruling just noted interposed with an observation that the District Attorney was "calling for the contents of a document which is not in evidence as such" and, further, that "what the indictment charges is best proved by the contents of the indictment * * * and not by this witness's conclusion as to what it contains." The District Attorney then offered the indictment itself in evidence, the defendant renewed his objection, and the judge without qualification or limitation said "your objection is overruled." The indictment was then read to the jury.

It will be observed that at this stage the state of the record was unexceptionable. Reading the incident in its proper context in the record it is plain that the District Attorney sought to prove that the deceased on July 26, 1952 had lawful authority to arrest the defendant because (1) there was a valid warrant of arrest outstanding and (2) that the defendant's arrest was sought "for any felony cognizable under the laws of the United States." For such proof would establish the authority of the defendant as an F.B.I. agent to accomplish the defendant's arrest under 18 U.S.C.A. § 3052. And the authority of the agent was highly material to bring the case within the reach of 18 U.S.C.A. § 1114 which denounced the killing of an F.B.I. agent "while engaged in the performance of his official duties, or on account of the performance of his official duties". Since the indictment was thus admissible on the issue of the agent's authority there was no error in the Judge's ruling. Certainly, at that stage it was not incumbent on the Judge to suspend the progress of the trial while he considered the impact of the document on all the other open issues of the case and then and there to qualify and limit his ruling.

After the reading of the indictment defendant's counsel moved for a mistrial on the ground that "the reading of its contents to the jury had so prejudiced the defendant in the eyes of the jury, and had a tendency to so inflame their passions and prejudice as to divert their attention from the main issue in this case * * * that is the charge as to which the defendant is on trial * * that the defendant cannot get a fair trial." This motion was promptly denied but it apparently served to divert the judge's attention from the proper impact of the indictment on the question of the agent's authority to the defendant's fear that the indictment for the bank robbery might be treated as proof of the subsequent crime for which the defendant was on trial. In order to guard against that danger the judge observed in the hearing of the jury that the indictment "is to be considered solely by the jury on the question of the defendant's motive as such motive may bear on his intent. The court will, at an appropriate time, instruct the jury in more detailed terms the purpose for which this evidence has been received and the limited consideration they may give it."

**178**

■■ It is, of course, obvious that the indictment could have no probative force even on the issue of motive unless it were shown that its existence became known to the defendant. As to this we may take judicial notice that it is frequent practice for federal indictments to be sequestered until the apprehension of those accused therein has been accomplished. And nowhere in the trial record is there evidence from which the jury might fairly infer that the defendant actually knew that there was a formal indictment outstanding accusing him by name. As we have already observed the testimony *as to the bank robbery* was pertinent to show the defendant's knowledge that he was wanted. But the *existence of an indictment,* standing alone, could not prove such knowledge.

■ However, never once in or out of the hearing of the jury did the judge suggest that the prior indictment, *without more,* was proof of knowledge. When he denied the motion for a mistrial, for aught he could then tell proof of the knowledge necessary to link the indictment with the defendant's motive might yet be offered. Certainly at the time the indictment was admitted there was no occasion for any further instruction to the jury as to its proper effect.

And the subsequent course of the trial completely obviated all need for the judge, as he promised, "at an appropriate time (to) instruct further on the subject matter." For in his summation counsel for the defense conceded that at the time of the shooting the defendant knew he was wanted. The District Attorney in his summation never once referred to the indictment and, as noted above, based his argument on the issue of motive on the testimony as to the bank robbery which, as we have held, was properly received on that issue. Thus, with no reference to the indictment in the summations, the judge wisely concluded that there was no need for him to refer to it or to explain to the jury that, standing alone, it had no tendency to prove bad motive on the part

of the defendant especially when in the summation it was conceded that the defendant had knowledge that he was wanted.

We hold that there was no error in the admission of the indictment.

The defendant further contends that the evidence was insufficient to support a verdict of first degree murder as defined by 18 U.S.C.A. §§ 1114 and 1111. We have, therefore, scrutinized the record for the evidence bearing on each essential element of the government's case.

Under 18 U.S.C.A. § 3052 the deceased, concededly an F.B.I. agent, had authority to "serve warrants." There was evidence that at the time a warrant for the defendant's arrest was outstanding and the warrant itself as well as the indictment on which it was predicated were in evidence. Moreover Section 3052 authorized arrests by F.B.I. agents "without warrant * * * for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed * * * such felony." There was ample evidence from which the jury could find that the deceased did indeed have reasonable grounds for such belief. We conclude that the authority of the deceased to make arrest of the defendant was fully established. There was abundant evidence that the deceased met his death in attempting the arrest and since his authority to arrest was established there was ample basis for a finding that his death occurred "while engaged in the performance of his official duties" which was an essential issue of the case under Section 1114.

■ On the trial, defense counsel conceded that the deceased died as a result of the gunshot wounds sustained in the hotel hall and in his summation further conceded that the only bullet extracted from the body of the deceased was fired from the defendant's gun (which was still in the defendant's hands after the shooting). There was undisputed evi-

dence that two bullets passed through the body: defense counsel on summation conceded that it was "self-evident," and certainly it was amply proved, that bullets from the defendant's gun and bullet holes were found low in the wall in back of the place where, according to the government's testimony, the deceased had a few seconds before been seen in a crouching position and where his body was lying after the shooting. Defense counsel also conceded, and we agree, that the evidence compelled an inference that the defendant shot with intent to kill. That the defendant intentionally killed the deceased was thus amply established, and sufficiently proved.

Was there sufficient evidence that the homicide was without justification? On this issue of self-defense, the defendant relies principally on the undisputed fact that at the time the deceased was dressed in slacks, with no official badge showing, and on the testimony of agents and an attending hospital surgeon called as witnesses by the prosecution, to whom the defendant after his arrest gave various accounts of the incidents of the affair. There were thus before the jury the defendant's statements made out of court that as he was passing the deceased the deceased drew a gun and the defendant then "tangled" with him and shot him in the course of the ensuing struggle. In these statements—relayed to the court through the witnesses— there was no assertion that the deceased shot first or that the defendant put up no resistance. Nor was there direct testimony to that effect from any source. The direct testimony went no further than to show that in the hall five shots had been fired from the deceased's gun and four from the defendant's; and that there had been two bursts of shots separated by a short interval.

However, there was abundant evidence that the defendant, knowing that he was wanted for a serious crime and hence with a motive to shoot to escape arrest, descended the stairs, certainly with a loaded gun and a dozen extra cartridges in his pocket, fearing that the hotel might already be "planted" with officers of the law. As to the defendant's statements made out of court, it was, of course, permissible for the jury to accept as true so much of the agent-witness's testimony as was damaging to the defense, as that the defendant had admitted he proceeded with his hand on his gun, and to reject the report of the defendant's out-of-court assertion of a struggle with the deceased as untrue. Especially was this so in view of the physical evidence of lack of fire burns on the clothing of the deceased, the position and nature of the wounds on his body and the mark of bullets fired from defendant's gun low on the wall behind deceased's position when last seen (except by the defendant) in a crouching position,—all of which was scarcely consistent with defendant's out-of-court assertion that the deceased was shot while in the defendant's grasp, engaged in a struggle. Further, there was strong ground for a damaging inference from the undisputed evidence that after the shooting in the hall the defendant tried to shoot his way out through the lobby of the hotel and was still shooting, with a gun in each hand when he reached the street. For surely such conduct was inconsistent with a belief on the part of the defendant that the deceased was a lawless assailant bent on robbery or other crime: if indeed such had been his belief, the jury might reasonably have concluded that he would have sought asylum in the hotel lobby.

The government strongly contended that there was physical evidence which required an inference that the deceased was shot while still crouching with his back partially exposed to the defendant when he entered the hall. In support of such an inference, in addition to facts noted above was the undisputed testimony that a bullet entering the deceased's lower abdomen had made a double entry wound as could result only from a fold in the flesh caused by the deceased's crouching position. We incline to agree that such an inference would be justified and that the fact that

the deceased was shot while crouching, if thus established, was corroborative evidence that the killing was without justification. However, even without this inference and, further, without the admission that defendant was proceeding with his hand on his gun, we hold that the government's proofs on the issue of self-defense were sufficient. We conclude that all the elements of the offense denounced by Section 1114 were sufficiently proved.

It remains to consider whether there was sufficient evidence that the unlawful killing was "deliberate, malicious, and premeditated", and hence within the definition of first degree murder as defined by Section 1111(a).

The evidence summarized above bearing on the issue of self-defense was ample in our judgment to support a finding that the killing was wilful, deliberate, malicious and premeditated. On this issue, too, we think the evidence would have sufficed even without the inference that the deceased was shot while crouching and without the testimony that the defendant had admitted out of court that he descended from the ninth floor of the hotel with a "snub-nosed gun in his pocket *and his hand on it.*" It may further be noted that there was no evidence at all which even suggested any possible lawful need for the defendant to have a gun on his person.

We conclude that each and every element entering into the crime of murder in the first degree was sufficiently proved. And we wish to make it plain that this conclusion is based not at all on the suggestion in the government's brief that "the requirement that guilt must be established beyond a reasonable doubt is directed to the case as a whole, and not to each element of the proof." Here the evidence was such that the jury might properly have found that beyond a reasonable doubt the government proved premeditation and every other essential element of the crime.

■ Lastly, the defendant claims prejudicial error in the selection of the jury.[1] In the course of his examination of the jurors on the *voir dire* the judge repeatedly posed the following question:

"Do any of you entertain any scruples which arise from matters of faith, belief or religion, or matters of conscience, which would prevent you from returning a verdict of guilty of murder in the first degree without qualification if you conscientiously felt that such a verdict was proper under the law and under the evidence as you understand it?"

■ The defendant claims that the question posed was erroneous in that it was confusing and in that its frequent reiteration in the hearing of the array, as jurors were successively drawn to fill vacancies in the panel, created a prejudicial atmosphere which at the very inception of the trial led jurors to feel that a verdict so qualified as to result in a life sentence of imprisonment would be subject to judicial disapproval. As to this, it is not necessary for us to say that the precise question put was perfectly adapted to its obvious purpose. We need only

---

1. We fully agree with defense counsel that their right to claim errors in the selection of the jury was fully preserved. Their statement, made when the process was completed, that the jury was satisfactory was obviously subject to their objections and exceptions theretofore stated. In any event, in a case such as this we should be reluctant—if not unwilling—to deem a substantial claim of error foreclosed by waiver of counsel. However, we do not question the validity of deliberate concessions of fact made by defense counsel in the course of the trial, including their summation. All these concessions were supported by an overwhelming weight of undisputed evidence. Doubtless counsel in making these concessions had concluded that it would hurt the defendant in the eyes of the jury on the contested issues of self-defense and premeditation, where his greatest hope of success lay, if the contest was carried to other issues on which the government's evidence was overwhelming. We think this was proper and skillful trial strategy.

say—as we do—that the question was reasonably adapted to disclose a fixed state of mind which, on a finding of guilt, irrespective of the evidence pertinent to the punishment, would preclude adherence to a verdict carrying a mandatory death penalty. The question was not erroneous merely because it was confusing.

Nor was there ground for the claim of prejudicial atmosphere in the impanelling of the jury. That laborious task was discharged with great dignity and patience on the part of the judge and was wholly free from inflammatory incidents irrelevant to the process. At most, a juror might reasonably have supposed that by asking the question above quoted the judge thought the subject-matter important,—as indeed it was. Neither from the content of that question nor from other incidents of the *voir dire* was there judicial intimation that only a verdict without qualification would be justified.

██ After beginning the selective task with an explanation to the array that the jury selected, in the event of conviction, would have power to decide whether the defendant should suffer the death penalty or life imprisonment, the judge then said:

> "So that jurors in this case *may be obliged under their oaths as jurors*, if they are convinced of the guilt of the defendant beyond a reasonable doubt of murder in the first degree, to return such a verdict of guilty of murder in the first degree without qualification, in which event the defendant shall suffer death." (Emphasis supplied.)

The defendant objects that this was contrary to the holding of Winston v. United States, 172 U.S. 303, 19 S.Ct. 212, 43 L.Ed. 456. But the objection loses all force when the observation just quoted is read in its context. For the Judge immediately balanced the quoted observation with the following:

> "Or the jury *may*, if it is convinced beyond a reasonable doubt of the guilt of the defendant of the crime of murder in the first degree, *return*

such a verdict and qualify its verdict by adding thereto 'without capital punishment.' So that, by law, there is placed upon the jury in this case not only the heavy burden and responsibility of determining the guilt or innocence of this defendant of the crime of murder in the first degree, but of also determining *whether or not* such a verdict shall or shall not be followed by capital punishment inflicted upon the defendant." (Emphasis supplied.)

Moreover, frequently in the course of the *voir dire*, as well as later in his charge, the judge informed the jury in the language of the Winston case:

> "How far considerations of age, sex, ignorance, illness or intoxication, of human passion or weakness, or sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused, in the event of his conviction of the crime of murder in the first degree, should or should not be capitally punished, is committed by the Act of Congress to the sound discretion of the jury and of the jury alone."

And this instruction was coupled with the question by the judge:

> "Do any of you feel that you cannot accept that as the law applicable to this case?"

A few minutes later, the Judge said this:

> "I state now to all the talesmen that the exercise of this judgment whether or not a verdict of guilty of murder in the first degree shall or shall not be accompanied by the infliction of capital punishment rests solely with the jurors, without any qualification or limitation of any kind whatsoever."

And a little later this:

"The law puts no limitation upon the jury in the exercise of that discretion which is granted to them to qualify or not to qualify a verdict of murder in the first degree."

And so, reading the record in context, it is altogether plain that in the course of the selective process jurors could not have failed to understand that the decision as to the alternative punishments would eventually lie within the discretion of the jury and that a mere finding of guilt would not "oblige" them to inflict the death penalty. Doubtless due to the gravity of the subject-matter, the courtroom was pervaded by a sombre atmosphere. But we find no basis for the claim of "prejudicial atmosphere" or of prejudicial conduct by the Judge or others in the course of the *voir dire*.

Nor was the selection of the jury unfair in that only those with scruples or bias *against* capital punishment were excused. The judge, in the very words requested by defendant's counsel, asked the array "whether if they find the defendant committed murder in the first degree, they would, under no circumstances, regardless of the evidence, qualify their verdict by adding thereto 'without capital punishment.' " The jurors all answered in the negative. And later, after the array had been augmented, the judge asked:

"Do any of you hold to a belief that a conviction of murder in the first degree should be followed by capital punishment, irrespective of what I told you and what I tell you is the provision of the law, and irrespective of the fact that the law invests you with full power and sole discretion to determine whether or not a conviction of murder in the first degree should or should not be followed by capital punishment?"

In response to this question one talesman who stated that he believed "very strongly" in the death penalty was forthwith excused.

More fundamental is the claim that it was erroneous for the judge to excuse for cause twelve talesmen who in answer to the judge's interrogatories disclosed scruples against capital punishment. There is, we agree, a substantial school of thought throughout the country which in the abstract is opposed to capital punishment. The defendant argues that since a jury should be a cross-segment of society, a scruple or fixed belief for or against capital punishment in murder cases does not constitute disqualification for jury service in a murder case, at least under the statute, 18 U.S.C.A. § 1111(b), upon which this prosecution was laid. And so, it is argued, the excuse of talesmen on that ground resulted in an unbalanced jury, not truly reflecting contemporary social thought.

The provision in the statute providing for a qualified verdict was first enacted in the Act of January 15, 1897, 29 Stat. 487. Prior to that time, in cases under federal penal statutes providing for capital punishment it had been held proper to excuse talesmen who had scruples against capital punishment: those who had scruples which, if adhered to, would prevent them from giving effect to the law of the land were deemed not qualified for that particular service.

In United States v. McMahon, 26 Fed. Cas.No.15,699, p. 1131, a murder case tried in the Circuit Court, District of Columbia, a juror was excused for cause because he was conscientiously opposed to punishment by death. In United States v. Ware, 28 Fed.Cas.No.16,641, p. 404, the defendant was on trial for burglary in the Circuit Court, District of Columbia, in 1824. Under the applicable statute, burglary was punishable by death. Two Quakers "with scruples of conscience in regard to the lawfulness of capital punishment" were excused for cause. Likewise in United States v. Wilson, 28 Fed.Cas.No.16,730, p. 699. In United States v. Hewson, 26 Fed.Cas.No. 15,360, p. 303, a murder case tried in the Circuit Court of Massachusetts in 1844, Circuit Justice Story permitted the dis-

trict attorney to ask each juror "whether he had any conscientious scruples as to finding a verdict of guilty in a capital case", with the observation that this had been the practice in "this court for the last twenty-five years, ever since the escape of two of the most atrocious men he ever knew in Rhode Island, through the scruples of two jurymen."

In Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429, it appeared that the defendants had been tried in a United States Circuit Court in Texas on a charge of conspiracy, in the course of which murder had been committed, on an indictment charging violation of R.S. §§ 5508 and 5509. The latter statute provided that any felony committed in the course of the proscribed conspiracy "shall be punished * * * with such punishment as is attached to such felony * * * by the laws of the state in which the offense is committed." The alleged murder had been committed in Texas the statute of which provided: "the punishment of murder in the first degree is death, or imprisonment in the penitentiary for life; and the degree of murder, as well as the punishment, is to be found by the jury." 12 S.Ct. 618. After trial the jury found the defendants guilty of the conspiracy charged but not guilty of murder. On appeal, the defendants claimed error, in that the trial judge had excused jurors with scruples against capital punishment. The court said:

"As the defendants were indicted and to be tried for a crime punishable with death, those jurors who stated on *voir dire* that they had 'conscientious scruples in regard to the infliction of the death penalty for crime' were rightly permitted to be challenged by the government for cause. A juror who has conscientious scruples on any subject, which prevent him from standing indifferent between the government and the accused, and from trying the case according to the law and the evidence, is not an impartial juror. This court has accordingly held that a person who has a conscientious belief that polygamy is rightful may be challenged for cause on a trial for polygamy. Reynolds v. United States, 98 U.S. 145, 147, 157 [25 L.Ed. 244]; Miles v. United States, 103 U.S. 304, 310 [26 L.Ed. 481]. And the principle has been applied to the very question now before us by Mr. Justice Story in United States v. Cornell [Fed.Cas.No.14,868], 2 Mason, 91, 105, and by Mr. Justice Baldwin in United States v. Wilson [Fed.Cas.No.16,730], Baldw., 78, 83, as well as by the courts of every state in which the question has arisen, and by express statute in many states. Whart.Crim.Pl. (9th Ed.) § 664."

The federal cases which followed the enactment of the statute in 1897 are directly opposed to the interpretation for which the defendant contends. Funk v. United States, 16 App.D.C. 478, certiorari denied 179 U.S. 683, 21 S.Ct. 916, 45 L.Ed. 385, decided in 1900, was an appeal from a conviction of murder under the 1897 Act. It appeared that on the *voir dire* the judge had inquired of jurors if they had any bias or prejudice against life imprisonment as a punishment in murder cases. When the jurors responded in the negative, defense counsel sought more detailed inquiry as to bias or prejudice which the Judge denied. To the claim of error based on this denial the court spoke as follows:

"We see nothing in the Act of Congress as interpreted which holds to any other reasonable conclusion than that the necessary test of the qualification of jurors in a trial of murder is that they shall have no bias in favor of or against either form of punishment. They should stand indifferent between the government *and* the accused on this as in all other questions involved in the case. All that can reasonably be demanded by either the government or the accused is that they come to this question after the ascertainment of guilt in this impartial state of mind prepared to exercise clemency or

not, according to their own judgments, and consciences, unaided by the advice of the court, and guided only by the sense of their solemn responsibility, which is the performance of their full duty to the Government as well as to the accused."

This definition of a juror's eligibility under the statute was more than *dictum* as the defendant suggests in his reply brief. The court adopted the test announced as the basis of its holding: only if the jurors' eligibility in conformity with that test had been sufficiently established could the court have sustained the ruling of the trial judge refusing further inquiry of the jurors on the subject-matter. The test of the Funk case was shortly thereafter reaffirmed by the same court in Snell v. United States, 16 App.D.C. 501.

In Gillars v. United States, 87 U.S. App.D.C. 16, 182 F.2d 962, 980, a juror had been asked on *voir dire* whether she was "opposed to the death penalty". It was held that her reply that "she was opposed to the death penalty and did not believe she could render a fair and impartial verdict in the case" was a disclosure of a disqualification requiring excuse for cause, and the question asked was not held to be improper.

And in Stroud v. United States, 251 U.S. at page 380, 40 S.Ct. 176, 64 L.Ed. 317, it was held that a juror should be excused for cause if from his preliminary examination it is "reasonably certain that in the event of conviction for murder in the first degree he would render no other verdict than one which required capital punishment." If jurors with bias *in favor* of capital punishment are disqualified, certainly jurors with bias *against* the death penalty should be similarly disqualified. Any holding to the contrary would make not for "balanced juries" but rather for lop-sided juries.

Turning to an examination of the cases in the state courts on the point, we find at least three cases in which the defendants made the very argument advanced here, *viz.*, that the modification of a statute under which the death penalty was mandatory by provision of an alternative punishment by imprisonment with power in the jury to decide between the two alternatives, impliedly repealed the disqualification for scruples against capital punishment which had theretofore existed. But in each, the courts held otherwise. State v. Owen, 1953, 73 Idaho 394, 253 P.2d 203; Rhea v. State, 1902, 63 Neb. 461, 88 N.W. 789; State v. Riley, 1923, 126 Wash. 256, 218 P. 238. And in many other states having statutes similar to the Federal Statutes of 1897 it has been held that scruples against capital punishment are a disqualification. Demato v. People, 1910, 49 Colo. 147, 111 P. 703, 35 L.R.A.,N.S., 621; Gross v. State, 1850, 2 Ind. 329; Price v. State, 1930, 159 Md. 491, 151 A. 408; Borowitz v. State, 1917, 115 Miss. 47, 75 So. 761; State v. Wooley, 1908, 215 Mo. 620, 115 S.W. 417; State v. Juliano, 1927, 103 N.J.L. 663, 138 A. 575; Commonwealth v. Bentley, 1926, 287 Pa. 539, 135 A. 310. It is perhaps worth noting that in Commonwealth v. Bentley, the court cited the rule of Logan v. United States, supra, decided prior to the 1897 Statute, as applicable under a state statute substantially the same as the 1897 Statute. For other cases in states which have similar statutes and in which the disqualification exists under sanction of statute, see the following: Leigh v. Territory, 1906, 10 Ariz. 129, 85 P. 948; People v. Rollins, 1919, 179 Cal. 793, 179 P. 209; Smith v. State, 1911, 5 Okl.Cr. 282, 114 P. 350; Gonzales v. State, 1893, 31 Tex.Cr.R. 508, 21 S.W. 253, 254; State v. Greer, 1883, 22 W.Va. 800; State v. Melvin, 1856, 11 La.Ann. 535.

So far as we are aware, the only states in which there are decisions to the contrary are Iowa and South Dakota. See State v. Lee, 1894, 91 Iowa 499, 60 N.W. 119; State v. Wilson, 234 Iowa 60, 11 N.W.2d 737; and State v. Garrington, 1898, 11 S.D. 178, 76 N.W. 326.

█ It will be noted that all the cases above cited stem from the fundamental theory that the American jury should be composed of impartial jurors. As a result, a party is entitled to an array of

impartial jurors to which he may direct his peremptory challenges. To this a party is entitled as of right. But granted this, a party is entitled to no more. Having no legal right to a jury which includes those who because of scruple or bias he thinks might favor his cause, he suffers no prejudice if jurors, even without sufficient cause, are excused by the judge. Only if a judge without justification overrules a challenge for cause and thus leaves on the panel a juror not impartial, does legal error occur. And often the failure of a party to exhaust his peremptory challenges is taken as convincing indication that, even if a talesman without sufficient justification had been excused for cause, at least those who were impanelled were indeed impartial. Shettel v. United States, 1940, 72 App.D.C. 250, 113 F.2d 34; Shepard v. United States, 10 Cir.1933, 62 F.2d 683, reversed on other grounds, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196; Vesely v. United States, 9 Cir.1921, 276 F. 693, certiorari denied 259 U.S. 588, 42 S.Ct. 590, 66 L.Ed. 1077; Campbell v. United States, 9 Cir., 221 F. 186; Simpson v. United States, 8 Cir.1911, 184 F. 817; United States v. Davis, C.C., W.D.Tenn. 1900, 103 F. 457, 470. See also Northern Pacific R. R. Co. v. Herbert, 116 U.S. 642, 6 S.Ct. 590, 29 L.Ed. 755; Hopt v. People of Utah, 120 U.S. 430, 7 S.Ct. 614, 30 L.Ed. 708; Fall v. United States, 60 App.D.C. 124, 49 F.2d 506, certiorari denied 283 U.S. 867, 51 S.Ct. 657, 75 L.Ed. 1471; Stroud v. United States, 1919, 251 U.S. 15, 20, 40 S.Ct. 50, 64 L.Ed. 103, rehearing denied 251 U.S. 380, 40 S.Ct. 176, 64 L.Ed. 317; Marande v. Texas & P. Ry. Co., 2 Cir. 1903, 124 F. 42, appeal dismissed 197 U.S. 626, 25 S.Ct. 800, 49 L.Ed. 912; State v. Juliano, 1927, 103 N.J.L. 663, 138 A. 575; Hall v. United States, 1948, 83 U.S.App.D.C. 166, 168 F.2d 161, 4 A.L.R.2d 1193, certiorari denied 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775, rehearing denied 335 U.S. 839, 69 S.Ct. 9, 93 L.Ed. 391.

 We do not understand the defendant now to dispute the general applicability of this doctrine. Nor does he now contend that any of the jurors actually impanelled were other than impartial. Indeed, he waived his final peremptory challenge. Rather, he contends that the 1897 Statute should be interpreted to except such doctrine from applicability to cases arising under the Statute; that the Statute impliedly eliminated scruple or bias against capital punishment as disqualification for cause; and that it sanctioned "balanced juries" which might properly include jurors with such scruples.

It will readily be seen that this "balanced" jury, which the defendant envisages, is in reality a "partisan jury": if, as he urges, it may include jurors with bias or scruples against capital punishment it must—if it is to have "balance"—include also those with bias in favor of the death penalty as the punishment for murder. It is settled by Andres v. United States, 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055, that under the Statute the verdict must be unanimous both as to guilt and as to punishment. As a result, as Mr. Justice Frankfurter noted in his concurring opinion, 333 U.S. at page 766, 68 S.Ct. at page 892, any juror "can hang the jury if he cannot have his way" as to the sentence which *he* deems appropriate. These considerations lead to the conclusion that trials before "balanced juries," even on unanimous findings of guilt, would frequently result in disagreements. And disagreements on successive trials would result in practical immunity from murder. We cannot believe that the Statute was intended to have such a tendency.

We find nothing in the Congressional History of the Statute which suggests an intent to accomplish such a radical modification of our basic jury system even for purposes of cases arising under the Statute. H.R.Report No. 545, 53rd Cong.2d Sess., spoke of the "growing sentiment against capital punishment" and stated that the bill then before the House was intended to give full scope to the "spirit of the people and of the age." Senate Report No. 846, 53rd Cong. 3rd

Sess., noted that the right of the jury to qualify their verdict "preserves sufficiently the deterrent as well as the punitory value of the extreme penalty." And, further, that "the leading object of this bill is to diminish the infliction of the death penalty by limiting the offenses upon which it is denounced, and by providing in all cases a latitude in the tribunal which shall try them to withhold the extremest punishment when deemed too severe." See Andres v. United States, supra, 333 U.S. at page 748, 68 S.Ct. 880, note 11. Surely in this there is nothing to suggest an intent that in the administration of the Statute those having scruples against the death penalty were to be deemed qualified to sit as jurors in murder cases. It goes no further than to show intent to provide "a latitude in a tribunal" composed of jurors without bias or scruples in favor of or against either form of punishment "to withhold the severest punishment when deemed too severe." If it had been intended that jurors with such bias or scruples were qualified to sit in murder cases, contrary to the long established rule of the federal courts then so recently exemplified by the Logan case, supra, one would have expected that the Congressional Committee Reports would have so indicated. But no Report of such content has been brought to our attention.

■ In view of the fundamental theory of the jury system mentioned above and the almost unanimous holdings of the federal and state courts cited above to the particular point here involved, we think it wholly inadmissible to "interpret" the Statute, as the defendant urges. We hold that under the Statute it was not erroneous for the judge to excuse for cause jurors having scruples against capital punishment.

■ The defendant further attacks the selection of the jury on the ground that jurors who, when asked if they had scruples against capital punishment, replied merely "I do," "were summarily excused by the Court without the slightest probing into the character or strength of their convictions, doubts or scruples." As to this it may be observed that at one stage in the selective process at the defendant's express request the Judge asked: "If you felt, under the instructions of the court, in accordance with the dictates of your conscience and in accordance to the law as I give it to you, capital punishment was a proper punishment to be imposed, would you under no circumstances return such a verdict"? And the answer was "I don't believe I would." For aught that appears the judge would willingly have directed the same question to each juror individually if so requested. But this aside, we think the need for further probing was for the judge to decide; that he was under no mandatory duty to probe further. In Funk v. United States, supra, in the course of the examination on *voir dire,* defense counsel had sought further inquiry into the basis of a juror's scruples. On appeal, the court said:

"It would be difficult, indeed, if not impossible, for one—without bias or prejudice in respect of the penalty—to explain in advance of the hearing just what circumstances would induce him to recommend or to insist on the recommendation of clemency; and, in our judgment, an attempt to probe his mind and conscience farther than to ascertain the existence of this necessary want of bias or prejudice would subject him to an ordeal not to be tolerated save under an express requirement of a statute."

We agree, and find no error on that score.[2]

2. Even if some jurors were excused without sufficient showing of disqualifying scruples, under the cases cited above it was not prejudicial error. No jurors were accepted whom the defendant unsuccessfully challenged for cause and there is nothing to show that the jurors actually impanelled had been disclosed to be

Turning now from the selection of the jury, which we find to have been unexceptionable, to its return of a verdict of guilty of murder in the first degree, under which the death penalty was mandatory, the record shows that at that fateful hour in the defendant's life the following transpired:

"The Court: Gerhard A. Puff, will you stand up, please?

(The defendant rises.)

"The Court: You may make any statement you desire before sentence of the Court is pronounced against you.

"The Defendant: Yes, I would like to thank both of my counsel, Mr. Nickerson and Mr. Gellinoff, for the wonderful job they did in representing me as defendant. I would like to thank you, your Honor, for your fairness throughout the entire trial, also in charging the jury. I would like to say to the lady and to the gentlemen of the jury I feel no ill will or any animosity towards any of you, but I am not guilty of this verdict. I am guilty of defending my own life. Thank you."

We are glad to record this statement for its indication that the defendant, notwithstanding his proved violence and lawlessness, still had at least a spark of magnanimity. Needless to say, we have treated the statement not at all as a waiver of any claim of legal error in the trial. On the contrary, it has perhaps served to emphasize our responsibility to examine the entire record with extreme care for the possibility of prejudicial error. This we have done. We have considered not only the claimed grounds of error but also have closely scrutinized the entire record from cover to cover—the proceedings on the selection of the jury, the opening statements of counsel, the trial transcript and all exhibits re-ferred to in argument or brief, the Judge's rulings on requests to charge, the summations of counsel and the Judge's charge.

We find no prejudicial error whatever. The prosecution was thorough—as it should be, and of devastating effect. But it was conducted throughout with all reasonable restraint. The defendant was skillfully represented both on the trial and on the appeal by assigned counsel to whom the thanks of both courts are due for a performance which, notwithstanding the personal sacrifice involved, measured up to the high traditions of the Bar. And since assurance of justice depends on the arduous participation of skillful defense counsel, we take it upon ourselves to extend to counsel the thanks of a powerful Republic which has pride in the quality of its justice—but which as yet in its federal establishment has lagged behind most of the States in the provision at public expense of public defenders for those charged with crime.

The presiding judge displayed throughout a high degree of dignity, patience, courtesy, fairness, and professional accuracy. The evidence amply satisfied the high degree of proof which rested on the prosecution as to every essential element of the offense charged and thus amply supported the verdict of the jury. As a result of the combined efforts of all participating, the defendant had a fair trial in every respect.

This is not the time or place for disquisition on the merits or the justification of capital punishment.[3] Or of the wisdom of legislation which inflexibly, for every defendant coming within its ambit, confines the responsible tribunal to the choice between life or death solely on the basis of the trial record and without the benefit of the pre-sentence report which after conviction for lesser crimes is generally available under Rule 32(c),

other than impartial. That, so far as disclosed, they were in fact impartial is inferable from the fact that the defendant waived his final peremptory challenge.

3. For a comprehensive study, prepared under the editorship of Thorsten Sellin, of numerous aspects of this problem see the November 1952 issue of The Annals of the American Academy of Political and Social Science (Vol. 284).

Fed.Rules Crim.Proc. 18 U.S.C.A. and which so often contains information extraneous to the trial record but helpful to the intelligent formulation of an appropriate sentence. Our responsibility is discharged when we find—as we do—that the conviction and the sentence is in all respects in accord with the law and the facts. Let the law proceed on its stern course.

Judgment affirmed.