**UNITED STATES v. PUFF.**

United States District Court
S. D. New York.

July 2, 1954.

776

J. Edward Lumbard, U. S. Atty., and George H. Bailey, Asst. U. S. Atty., New York City, for U. S.

Emanuel L. Gordon and Jerome G. Shapiro, New York City, for defendant.

RYAN, District Judge.

The defendant moves under the provisions of Section 2255, 28 U.S.C.A., and Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., to vacate and set aside the judgment of conviction and sentence of death imposed upon him and for a new trial under an indictment which charges that on July 26, 1952 he, with malice aforethought, deliberately and with premeditation, shot and killed Joseph J. Brock, then an agent of the Federal Bureau of Investigation engaged in the performance of his official duties.

This motion is made after trial and conviction of the defendant by jury verdict of Murder in the first degree, without qualification as to punishment, and after affirmance of the conviction by the Court of Appeals, 211 F.2d 171, and denial by the Supreme Court of a petition for a writ of certiorari and denial by that Court of a petition for rehearing. It is claimed in support of this motion that "defendant was, as a result of certain rulings of the trial court and the decision of the Court of Appeals for the Second Circuit, denied due process of law and the substance of a fair trial," and that there was "error dehors the record."

The substance of the first claim is that the defendant was denied effective representation by counsel at the trial because the trial court admitted in evidence on the question of motive an indictment which charged the commission by this defendant of a bank robbery in Kansas, while on appeal the Court of Appeals ruled that although the indictment could not be considered on the question of motive it was properly before the jury as evidence of the authority of the deceased to arrest the defendant and as tending to show that the deceased had been killed in the performance of his official duties.

The indictment is described as "highly inflammatory and prejudicial" because it charged that the defendant "by force and violence" took a large sum of money from a national bank and in doing so "did assault and put in jeopardy the life" of the bank cashier and other employees of the bank and that this was done by use of "dangerous weapons."

The warrant (Gov.'s Ex. 49) issued on this indictment contains a command to any United States Marshal to arrest the defendant and to bring him before the District Court for the District of Kansas "to answer an indictment charging him with bank robbery and assault in violation of Title 18, 2113(a) and (b)." No question is raised as to the admissibility

of the warrant. The warrant of itself revealed neither the date of the robbery nor the name of the bank or its location. Oral testimony established the fact of a robbery in which the defendant participated; the warrant, the authority for the defendant's arrest; and the indictment, that the warrant had been issued for this particular robbery and that the defendant's arrest was sought as a participant in it.

The indictment in simple though legal verbiage alleged in the first count, that on November 23, 1951, one George Arthur Heroux and the defendant held up and robbed the bank, and that in so doing did assault and put in jeopardy the life of employees of the bank by use of dangerous weapons, to wit, a rifle and a revolver; and in the second count, that the defendant and his named confederate did on that day enter the bank premises with intent to commit a robbery.

The indictment charged no more, and in fact far less, than was established by admittedly competent oral testimony and the inferences flowing from it.

There was testimony that the bank had been held up on November 23, 1951, at about 8:30 a. m. A witness, an employee of the bank, testified that when she entered the bank she was "stopped by a man with a rifle" (S.M. 746) who told her to remove her coat and sit down. She identified the defendant as this man and added that "there was another armed man," (S.M. 747) and that they remained in the bank until approximately ten minutes to nine. The testimony of this witness concerning the bank robbery was sufficient to support an inference of the wrongful purpose of the defendant and his confederate. There was no cross-examination of this witness and no witness was called by the defendant to contradict her testimony on the identification. With the testimony of defendant's participation of the bank robbery properly before them, it is stretching imagination too far to say that proof of formal accusation by indictment for that crime served to inflame the minds of the jury and to prejudice them against the defendant.

There is no basis for inferring that the jury ascribed any significance to the fact that the defendant had been indicted for the bank robbery when it came to consideration of the question of motive. The jury was instructed as to the general law applicable to indictments when the court charged with reference to the indictment on which the defendant was on trial that,

"The indictment is not evidence. The fact that it has been filed against this defendant is not in any way to be considered by you in determining his guilt or innocence." (S.M. 854.)

The purpose for which the indictment was received in evidence was made manifest to trial counsel when just prior to the time it was offered the United States Attorney said of the indictment and the complaint before the Commissioner: " * * * I am not offering either of these documents in evidence, and I am trying to get at one single fact, and that is simply the date on which it is charged the defendant committed an offense." (S.M. 739.)

The defendant argues that the "purpose for which the highly prejudicial bank robbery indictment was introduced and read to the jury, was not known until the Court of Appeals decision was rendered," and from this premise continues that had defendant's counsel on trial been advised of the "theory of admission", to wit: on the question of whether the deceased was engaged in the performance of his official duties "counsel could have conceded this fact". Of course, many concessions could have been made but counsel did not choose to make them.

It is urged that trial counsel offered to concede that the deceased was engaged when killed in the performance of his official duties, but the trial record shows the contrary. The opening statement of the defense did not disclose an inclination to make any factual concession ex-

cept such as might be dictated by trial tactics. Here, counsel stated:

"In the first place, while we deny everything, including the fact that it was the shooting by the defendant which caused the deceased's death, nevertheless we cannot shut our eyes to certain obvious facts from which inferences may be drawn; and it may very well be, although we do not admit it, that the inference is inescapable that the deceased did meet his death from bullets fired from a gun that was at some time during this episode in the hands of the deceased." (S.M. 32.)

Although the United States Attorney had in his opening referred to the defendant's participation in the bank robbery, defense counsel in his opening informed the jury:

"We expect to prove that the defendant had no reason, apart from anything the Government attorney has said, had no reason to know that this particular man whom he encountered was a law enforcement officer, let alone an F.B.I. agent." (S.M. 33.)

At the close of the Government's case the court pointed out that the defendant by his plea of not guilty had put "in issue every material fact constituting the crime charged against him." The court also observed that at that stage of the trial the defendant had made "but two limited concessions: One, that the deceased at the time he sustained the injuries from which he died was, in fact, an FBI employee; two, that he died as a result of gunshot wounds inflicted upon him." (S.M. 752.)

Specifically, the court called to trial counsel's attention that:

"There still remained the issue, and remains the issue of whether or not at the time the deceased received the wounds, he was then engaged in the performance of his official duties as an agent or employee of the Federal Bureau of Investigation, or whether he received these injuries and mortal wounds as a result of the performance of his duties as such an employee of the Federal Bureau of Investigation." (S.M. 752.)

The remarks of the court were followed by no further factual concessions and the defendant rested without making any. The factual concessions which were made were quite properly restricted by able and astute trial counsel to those matters which it was felt by them might be to defendant's advantage and were dictated by trial strategy and with due consideration to defendant's interest. The record affords no basis for a conclusion that trial counsel at any stage would have made any concession concerning the issuance of a warrant for defendant's arrest for the commission of the bank robbery in which he had been identified as a participant.

■ But, it would be presumptuous of this court to discuss this matter further. The claim now made by the defendant, insofar as it is based upon the admission of the Kansas indictment in evidence, has been considered by the Court of Appeals and resolved against him. The Supreme Court has refused to grant a writ of certiorari. Substantially, the same arguments now made were urged on appeal and rejected.

■ The second claim urged is that certain newly discovered evidence—two bullet holes or punctures in the defendant's trousers, when considered in the light of a bullet hole in the rear hallway —supports an inescapable conclusion that the shooting of the deceased by the defendant was without premeditation and deliberation.

The trousers worn by the defendant at the time of the shooting were received in evidence at the hearing on this petition. They have been examined by the court.

The left trouser leg has been cut off above the knee; what remains of this trouser leg shows two small holes on the left front side approximately 3 inches below the left side pocket opening and near the outer left leg seam. The upper

of these holes is approximately 1½ inches to the right and 1 inch above the lower hole. There are no black or powder marks about these holes and no burn marks. Two other holes are found in what remains of this same trouser leg: one, near the center or fly flap about 2 inches below the waist line, the other just to the left of the center crease about 13 inches below the waist line. The rear of the left leg of the trousers also shows a hole 18½ inches below the waist band and 1½ inches to the right of the rear center crease. The right leg also shows three holes: one about 2¾ inches below the waist band and 1 inch to the right of the fly; the second, about ½ inch to the right of the center front crease and about 15 inches below the waist band; the third, about 2 inches to the right of the front crease and about 20 inches below the waist band.

It is the two holes on the upper left front side of the left leg of the trousers that defendant points to as "newly discovered evidence." The relative position of these two holes and the fact that the bullet making them entered through the upper hole, passed through a small fold in the cloth of the trousers and went out through the lower hole (this is supported by the finding of the FBI ballistics expert who examined the trousers and is not disputed by the Government), the defendant urges demonstrates that the gun from which this bullet was fired was held by the deceased while he was in a standing position with the gun held at normal height, with arm flexed, at a distance of from 19 to 24 inches. Fired at that distance no burns or powder marks would appear on the trousers, and none are found on the cloth around the perimeter of these holes.

This "theory" the defendant argues finds further support in the testimony of Agent Van Dorn concerning a hole found in the west wall of the hallway. This testimony was before the jury on the trial but defendant now contends that it had not been "properly analyzed" by defendant's trial counsel. Van Dorn testified (S.M. 543):

"I observed a hole in the vertical moulding which was 9 feet 6½ inches from the north wall and 1 foot 5¼ inches from the floor, both measurements being to the center of the hole. This hole was in the nature of a groove between the moulding and the plaster wall. It was 1½ inches deep. The direction was slightly downward from the south and slightly into the wall toward the west."

It was at this same spot on the west wall that Agent Rogers testified that he had "pulled the moulding out and a spent bullet fell to the floor." (S.M. 448.) (This bullet from the gun of the deceased was marked Ex. 26.) The angle at which this bullet penetrated the wall was marked on the model of the hallway (S. M. 554); from this angle the defendant argues that if the bullet were fired from a point near the lobby door, it could have been fired only by Brock standing erect; if fired from a point near the fire exit door, Brock would have to have been in a crouching position.

Both the holes in the defendant's trousers and the holes just described, the defendant now says are inconsistent with the Government's position on trial that the defendant came through the fire door in the rear hall and caught Brock in a crouch in the southeast corner of the hall as he was peering through the glass door into the lobby. These physical conditions it is urged, support the defendant's statements made after arrest that he and the deceased encountered each other at close quarters near the fire door, when the defendant entered the rear hall, and that the deceased was shot in the course of that struggle.

The argument defendant makes is predicated upon the assumption that these bullet holes in the left leg of defendant's trousers were made by a bullet fired at him by the deceased while both were in the rear hallway where the body of Brock was later found.

The uncontradicted evidence, however, shows that after the defendant left the rear hallway he passed through the lob-

by which led to the street entrance of the hotel. In the lobby, the defendant met up with another agent, Hamilton; both fired but neither was wounded. The bullet from Hamilton's gun lodged in the south wall; the bullet fired from the defendant's gun (which it appeared was the gun of the deceased) ricocheted off the east wall and lodged in the north wall. There is nothing which precludes a finding that the bullet fired by Hamilton did not pass through the left leg of defendant's trousers.

As the defendant came running out of the entrance to the hotel on to the street, he met up with Agent Kerrigan. They exchanged shots and each fired once, neither of the shots striking its intended victim. Kerrigan fired a second shot and it was then that he observed the defendant drop his gun and throw his hand up in the air. Agent Rogers was on the street with Kerrigan when the defendant came out of the hotel. Rogers fired four times at the defendant; this made a total of six bullets fired at the defendant while he was in the street. There is nothing which precludes a finding that one or more of at least five of the six bullets fired at him did not pass through the defendant's trousers. One of these six bullets did enter the left leg of the defendant about 6 inches above the knee joint.

The argument now advanced is entirely speculative. Only Brock and the defendant were in the hallway at the time of the homicide. Brock is dead and the defendant offered no evidence to contradict the testimony as to the physical conditions of the hallway after the affray. From this and ample supporting evidence, the jury reached its verdict.

Defendant's counsel before trial were afforded the opportunity to examine the trousers and they made an inspection on two occasions. They decided not to introduce the trousers in evidence or to inquire as to the bullet holes in them. The existence of the bullets and of the holes found in the hallway was the subject of extensive inquiry on trial. The suggestion that trial counsel did not appreciate the significance or importance of the holes in the defendant's trousers finds no support in the trial record.

While nothing here presented by the defendant meets the legal requirements of "newly discovered evidence" the motion has been considered on its merits and found to be without weight or substance.

The court desires to express its appreciation of the diligent efforts of the two very competent members of the bar of this court, who have appeared for the defendant on this application. They readily accepted assignment by the court when the defendant requested that new counsel be assigned after his former counsel asked to be relieved.

I find no relevant or material issue of fact which requires further hearing or which makes it necessary to take testimony. Both the defendant and the Government have stated that they desire to offer no testimony.

I have concluded after examination of the files and records of the case that the defendant petitioner is entitled to no relief, that the sentence imposed was authorized by law, that jurisdictional requirements have been fully met, that the judgment of conviction is not otherwise open to collateral attack on any of the grounds urged, and that there has been no denial or infringement of the constitutional rights of the defendant.

Execution of the sentence imposed has been ordered to be carried out during the week of July 19, 1954; further stay of execution is denied.